Robert J. McDONNELL; Frederick N. Rasmussen, Appellants at Nos. 91–5951 & 5993,

v.

UNITED STATES of America; Department of the Navy; Department of Justice,

United States of America and Department of Justice, Appellants at No. 91–5916.

Nos. 91–5916, 91–5951 and 91–5993.

United States Court of Appeals, Third Circuit.

Argued Aug. 19, 1992.

Decided Sept. 21, 1993.

Joseph J. Hillman, Jr. (argued), Belmar, NJ, for appellants Robert J. McDonnell and Frederick N. Rasmussen.

Stuart M. Gerson, Asst. Atty. Gen., Michael Chertoff, U.S. Atty., John F. Daly (argued), Leonard Schaitman, John P. Schnitker, U.S. Dept. of Justice, Civil Div., Appellate Staff, Washington, DC, for appellants U.S. and Dept. of Justice.

Before HUTCHINSON, COWEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Appellants and cross-appellees Robert J. McDonnell and Frederick N. Rasmussen (collectively "Plaintiffs")[1] filed this action in the United States District Court for the District of New Jersey against appellees and cross-appellants the Department of the Navy ("Navy") and the Department of Justice ("DOJ") in its capacity as representative of the Federal Bureau of Investigation ("FBI") (collectively the "Government"). Plaintiffs seek disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C.A. § 552 (West 1977 & Supp.1993), of certain information the Government has withheld concerning the 1934 Morro Castle disaster. The Morro Castle disaster occurred when a fire broke out on an ocean liner just off the coast of New Jersey on September 8, 1934. *See United States v. Abbott,* 89 F.2d 166, 166 (2d Cir. 1937). Over one hundred deaths resulted. Strange circumstances surrounded the fire. Just hours prior to the fire the Captain of the ship died, and there was a delay of almost an hour between the outbreak of the fire and the sending of an SOS signal. *See id.* (overturning conviction of chief officer and engineer of ship for criminal negligence in operation of vessel); *see generally* Thomas Gallagher, Fire At Sea (1959) (concluding that fire on Morro Castle was deliberately set by ship's radio officer). Both Plaintiffs and the Government filed cross-motions for summary judgment. The district court granted each and denied each in part. All parties now appeal the portions of the district court's judgment adverse to their respective positions.

For the reasons that follow, we will affirm the order of the district court granting summary judgment to the Government under FOIA Exemptions 1 (matters relating to national security), 7(C) (records compiled for law enforcement purposes, disclosure of which would constitute an unwarranted invasion of personal privacy), and 7(D) (disclosure of identity of confidential sources or information they provide). 5 U.S.C.A. § 552(B)(1), (7)(C), (7)(D). We will also affirm the district court's order granting summary judgment to the Government under Exemption 3 (matters specifically exempted

---

1. The reference to plaintiffs McDonnell and Rasmussen, collectively, in connection with the actions taken before the administrative agencies should be read with the understanding that only McDonnell submitted and signed the document requests. *See infra* Section II. B.

from disclosure by statute) insofar as it permits the Government to withhold grand jury material, but we will reverse that order insofar as it permits the Government to withhold certain juvenile delinquency records requested by McDonnell. *Id.* § 552(b)(3). We will vacate the portion of the district court's order granting summary judgment to the Government under Exemption 6 and remand for further factual development. We will also vacate the district court's order granting summary judgment to McDonnell under Exemption 7(D) and remand for reconsideration in light of *United States Dep't of Justice v. Landano*, ⸺ U.S. ⸺, ⸺ ⸺ ⸺, 113 S.Ct. 2014, 2019–23, 124 L.Ed.2d 84 (1993). Finally, we will reverse the order of the district court granting summary judgment to McDonnell under Exemption 7(C).

## I. *Factual and Procedural History*

Plaintiffs are authors who are interested in the events surrounding the fire aboard the ocean liner Morro Castle and its subsequent grounding off the coast of Asbury Park, New Jersey on September 8, 1934. The FBI conducted an investigation following this disaster under the special maritime jurisdiction of the United States, 18 U.S.C.A. §§ 7, 13 (West 1969 & Supp.1993), in order to determine the cause of the fire and why so many lives were lost. A federal grand jury ultimately returned indictments against the owners and certain officers of the Morro Castle, charging them with willful neglect of duty under 18 U.S.C.A. § 1115 (West 1984). *See United States v. Abbott*, 89 F.2d 166 (2d Cir.1937) (overturning conviction of chief officer and engineer for violation of statute).

In June 1985, Plaintiffs began their quest for information regarding the Morro Castle fire and its subsequent investigation. In their first correspondence with the Office of Congressional and Public Affairs, dated June 14, 1985, Plaintiffs requested, under the FOIA, records pertaining to the Morro Castle, George White Rogers, George Alagna, and the "Black Tom" explosion. On July 29, 1985, Plaintiffs expanded their original request to include John B. Duffy. On March 24, 1986, the FBI released 666 of 1,029 pages regarding the Morro Castle and specified the exemptions claimed for the withheld documents.

On March 31, 1986, Plaintiffs appealed the FBI's refusal to release the withheld documents. The FBI released additional documents regarding the Morro Castle on May 21, 1986. On June 3, 1986, it released documents concerning George White Rogers. On July 14, 1986, the Office of Information and Privacy ("OIP") advised Plaintiffs some additional records pertaining to deceased individuals in the Morro Castle file would be released, but the FBI's decision to withhold the remainder of the requested documents would be affirmed.

On August 18, 1986, Plaintiffs appealed the FBI's withholding of the remaining records containing information about George White Rogers. The OIP denied this appeal on October 9, 1986, and also informed Plaintiffs that the FBI would not release information regarding George Alagna until it received evidence of his death.

In the course of processing Plaintiffs' original June 1985 request, the FBI located three Navy documents. It sent two of these documents to the Naval Military Personnel Command ("NMPC") and the third to the Naval Investigative Service Command ("NISCOM") for evaluation. Lieutenant Commander Brian D. Robertson of the Judge Advocate General's Corps ("JAG Corps") reviewed the two documents sent to NMPC and determined that one document could be released in its entirety. Robertson included an unredacted copy of this document with a letter to Plaintiffs dated June 9, 1986, notifying them that the NMPC had received two documents from the FBI that were responsive to Plaintiffs' original FOIA request. This letter also advised Plaintiffs that Robertson had sent the second document to the Office of Naval Intelligence for classification review. After examining the document, the Deputy Director of Naval Intelligence advised NMPC that it was no longer classified. The second document was accordingly released to Plaintiffs in its entirety.

NISCOM reviewed the third document and ultimately released it to Plaintiffs with deletions made pursuant to 5 U.S.C.A. § 552(b)(7)(C) (West 1977 & Supp.1993).

Plaintiffs appealed this decision to the Secretary of the Navy on August 25, 1986. This appeal was denied.

Approximately one year later, Plaintiffs filed a separate request for information on George White Rogers, John B. Duffy, Admiral W.F. Halsey, and other matters directly with NISCOM. NISCOM's search for this information disclosed no relevant documents or files. Because Plaintiffs did not ask NISCOM to forward their request to other divisions of the Department of Navy, no further search was conducted.

On August 22, 1988, Plaintiffs filed a complaint in federal district court seeking disclosure under the FOIA of the requested information withheld by the Government.[2] Plaintiffs sought preliminary and permanent injunctions ordering the disclosure of the following information:

1. The Navy records of George White Rogers.

2. The Navy records concerning "the outcome of the [Oscar] Niger investigation."

3. Information pertaining to Oscar Niger.

4. A threatening letter allegedly written by George White Rogers to Admiral Halsey.

5. Information withheld by the FBI pertaining to the Morro Castle, George Alagna, John B. Duffy, and the "Black Tom" file.

Plaintiffs also requested legible copies of all released documents, and that the court perform an *in camera* inspection of the withheld and redacted documents in order to ascertain the propriety of nondisclosure based on the specific exemptions asserted by the Government.

The Government filed an answer on November 4, 1988, generally denying Plaintiffs' claims and raising various defenses. In January 1989, Plaintiffs filed a motion for *in camera* inspection of the documents sought in the complaint. The Government responded that the motion was premature because it had not yet submitted its *Vaughn* index specifying the withheld documents and detailing

the agency's justification for claiming exemption. *See Patterson by Patterson v. FBI*, 893 F.2d 595, 599 n. 7 (3d Cir.), *cert. denied*, 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990) (citing *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974)). For this reason, the magistrate judge denied Plaintiffs' motion without prejudice.

On March 13, 1989, the Government filed its *Vaughn* index. It included the following proffers in support of the withheld documents: (1) the declaration of FBI Special Agent ("SA") William Earl Whaley regarding the material withheld pursuant to FOIA Exemption 1, 5 U.S.C.A. § 552(b)(1) (West 1977); (2) the declaration of FBI SA Angus Llewellyn regarding the material withheld pursuant to FOIA Exemptions 1, 2, 3, 6, 7(C), 7(D), and 7(E), 5 U.S.C.A. §§ 1, 2, 3, 6, 7(C)–(E) (West 1977 & Supp.1993); (3) the declaration of Lieutenant Commander Robertson regarding the two documents forwarded by the FBI to the NMPC; and (4) two affidavits by Jacqueline D. Marini, Assistant Information and Privacy Coordinator, NISCOM, regarding the document forwarded by the FBI to NISCOM. On July 25, 1989, plaintiff McDonnell filed his own affidavit in response.

On August 31, 1989, Plaintiffs moved for summary judgment and renewed their motion for an *in camera* review of the withheld and redacted documents. On October 26, 1989, the Government filed a cross-motion for summary judgment on grounds that in searching for the documents Plaintiffs requested it had done all that was reasonable, and that it had properly withheld the redacted and undisclosed information pursuant to the specified FOIA exemptions. The Government also filed the Second Declaration of SA Llewellyn at this time.

Oral argument on the motions took place on July 16, 1990 in United States Magistrate's Court. At the magistrate judge's direction, the Government also furnished for *in camera* inspection all materials produced to

---

**2.** Plaintiffs named as defendants the Navy and DOJ. This opinion primarily refers to the FBI rather then DOJ because the FBI is the body that

authorized the release and withholding of the requested documents.

the grand jury investigating the Morro Castle and its crew, accompanied by an *ex parte* declaration of SA Llewellyn concerning the materials produced.

On June 7, 1991, the magistrate judge filed a Report and Recommendation concluding, *inter alia,* that: (1) plaintiff Rasmussen lacked standing to sue because he never signed a FOIA request; (2) plaintiff McDonnell's requests for certain documents were either moot or premature, and he was not entitled to better copies of certain documents produced by the FBI; (3) the Government's withholding of certain documents under FOIA Exemptions 1, 3, and 6 was proper; and (4) the Government's withholding of certain documents under FOIA Exemptions 7(C) and (D) was proper, with the exception of documents relating to (a) the identities of any persons who the Government determined were deceased, (b) the identities of witnesses and other third parties whom the FBI had interviewed in connection with its investigations, and (c) sources of information who the magistrate judge found had received neither express nor implied assurances of confidentiality at the time of their interviews. The magistrate judge accordingly recommended that both Plaintiffs' and the Government's motions be granted in part and denied in part, thereby resolving "[t]he entire case." Both parties filed written objections. The district court adopted the Report and Recommendation "in its entirety" by order entered on September 11, 1991. Both Plaintiffs and the Government filed timely notices of appeal from that order.

## II. *Preliminary Issues: Jurisdiction & Standing*

### A. *Finality of the District Court's Order*

■ The district court exercised subject matter jurisdiction pursuant to 5 U.S.C.A.

§ 552(a)(4)(B) (West 1977)[3] and 28 U.S.C.A. § 1331 (West 1992).[4] At the threshold, we must decide whether the district court's order granting partial summary judgment to both parties is a final appealable order within the meaning of 28 U.S.C.A. § 1291 (West Supp.1993). The Government asserts that even if this order is not final, the portion ordering the Government to release certain withheld materials is an appealable injunction under 28 U.S.C.A. § 1292(a)(1) (West 1992).

Section 1291 confers on the courts of appeals "jurisdiction of appeals from all final decisions of the district courts of the United States...." The magistrate judge recommended granting summary judgment to the Government on all but three issues, on which it recommended granting summary judgment to Plaintiffs: (1) The withholding pursuant to Exemption 7(C) of the identity of witnesses and third parties interviewed in connection with the Morro Castle disaster; (2) the withholding pursuant to Exemption 7(C) of information regarding deceased persons to which no other exemption applies; and (3) the withholding pursuant to Exemption (7)(D) of information claimed to have been provided under implied assurances of confidentiality to which no other exemption applies.[5] The district court adopted the Report and Recommendation in its entirety.

The Report and Recommendation disposes of all substantive issues raised by the parties. The docket sheet does not reflect any pending motions in the district court. Plaintiffs' letter response to this Court's inquiry on the question of jurisdiction seems to indicate, however, that there is an outstanding motion for attorneys' fees:

> The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treatises of the United States. 28 U.S.C.A. § 1331.

**3.** This section provides in pertinent part that On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.
5 U.S.C.A. § 552(a)(4)(B).

**4.** This section provides that

**5.** The Government submits, and Plaintiffs agree, that to the extent that other exemptions may apply to the documents ordered produced under Exemptions 7(C) and (D), the parties have raised and the district court has addressed the applicability of those exemptions.

The above request [to certify the district court's judgment as final] is made on the assumption that Motions for attorney's fees need not be resolved first in the Third Circuit; particularly where appeals are contemplated in any event. If the assumption is incorrect, then all issues are not resolved.

Letter dated Dec. 2, 1991 from Joseph Hillman, Jr. to Bradford A. Baldus, Esq., ¶ 2, Motion Appendix, Exh. 9.

Even if a motion for attorneys' fees is still pending in the district court, that motion does not constitute a bar to our exercise of jurisdiction under § 1291. *See Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 198–202, 108 S.Ct. 1717, 1719–22, 100 L.Ed.2d 178 (1988) (decision on merits is final and therefore immediately appealable for purposes of § 1291 despite unresolved petition for attorney fees); *Halderman v. Pennhurst State School & Hospital,* 673 F.2d 628, 644 (3d Cir.1982) (in banc) (orders finally disposing of merits are appealable even though questions relating to attorneys' fees have been left undetermined) *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984). Because we have jurisdiction over this appeal under § 1291, we need not reach the Government's alternative argument that we may treat the district court's order requiring production of materials withheld under Exemptions (7)(C) and (D) as an appealable injunction under 28 U.S.C.A. § 1292(a)(1).

B. *Standing of Plaintiff Rasmussen*

■ A second preliminary issue concerns Rasmussen's standing to pursue this appeal under the FOIA. Although his interest was asserted, Rasmussen's signature does not appear on any of the FOIA requests, and he, himself, did not formally pursue administrative remedies upon the denial of these requests. The district court accepted the magistrate judge's recommendation that it hold Rasmussen lacks standing to sue in the present case because he failed to make any administrative request of his own for the information he and McDonnell now seek.

Rasmussen first argues that he has standing under the plain language of the FOIA, which requires agencies to make records and information available "to any person," 5 U.S.C.A. § 552(a)(3) (West 1977), and does not prohibit one requester from acting on behalf of others nor require each member of a group interested in the information to sign a request. Rasmussen reads § 552(a)(3) too literally. An agency's duty to make records available to "any person" under that section is not absolute. Instead, § 552(a)(3) conditions the agency's duty upon receipt of a request that is made in accordance with published rules stating the time, place, fees, and procedures to be followed and that reasonably describes the records sought. 5 U.S.C.A. § 552(a)(3)(A)–(B); *see* 28 C.F.R. § 16.1(b)(5) (1992) (defining "requester" as any person who makes request to component of DOJ); *id.* § 16.1(b)(4) (defining "request" as any request for records made pursuant to 5 U.S.C.A. § 552(a)(3)); *id.* § 16.3 (delineating requirements for FOIA requests submitted to DOJ); 32 C.F.R. § 701.7 (1992) (outlining requirements for FOIA requests submitted to Navy). Upon receipt of such a request, the agency must determine within ten days whether it will comply with the request "and shall immediately notify *the person making such request* of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination." 5 U.S.C.A. § 552(a)(6)(A)(i) (West 1977) (emphasis added); *accord* 32 C.F.R. § 701.7(a) (1992). The requesting individual must appeal an adverse determination to the head of the agency before filing suit in federal court. 5 U.S.C.A. § 552(a)(4), (6)(A)(ii); *see Dettman v. Department of Justice,* 802 F.2d 1472, 1476–77 (D.C.Cir.1986) (FOIA lawsuit subject to dismissal for lack of subject matter jurisdiction if plaintiff fails to timely exhaust administrative remedies); *accord Hymen v. Merit Systems Protection Bd.,* 799 F.2d 1421, 1423 (9th Cir.1986), *cert. denied,* 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987); *Brumley v. Department of Labor,* 767 F.2d 444, 445 (8th Cir.1985); *see also Oglesby v. Department of Army,* 920 F.2d 57, 61–65 (D.C.Cir.1990).

We think a person whose name does not appear on a request for records has not made a formal request for documents within the

meaning of the statute. Such a person, regardless of his or her personal interest in disclosure of the requested documents, has no right to receive either the documents, *e.g.,* 32 C.F.R. § 701.7(c)(1)–(3) (1992), or notice of an agency decision to withhold the documents, *see id.* § 701.7(a); 5 U.S.C.A. § 552(a)(6)(A). Rasmussen essentially concedes this point. *See* Reply Brief for Plaintiffs at 8 (acknowledging that § 701.7 establishes procedures for requesting records from Navy under FOIA, "imply[ing] that the identity of the requester or requesters be disclosed so that the Navy can reply to the request"). Accordingly, a person like Rasmussen whose name does not appear on a FOIA request for records may not sue in district court when the agency refuses to release requested documents because he has not administratively asserted a right to receive them in the first place.

The legislative history of § 552 supports this conclusion. House Report No. 1497 rejected "the negative approach of the present law (5 U.S.C. § 1002) which permits only persons properly and directly concerned to have access to official records" and heralded the FOIA as "establish[ing] the basic principle of a public records law by making the records available to any person." H.R Rep. No. 1497, 89th Cong.2d Sess., *reprinted* in 1966 U.S.C.C.A.N. 2418, 2426. This language means that any person who submits a request may obtain access to governmental records regardless of whether they have a personal stake in the information sought. The following language in the cited section of the House Report is illustrative:

> The *persons requesting* records must provide a reasonable description enabling Government employees to locate the requested material....
>
> .... If a request for information is denied by an agency subordinate *the person making the request* is entitled to prompt review by the head of the agency. An *aggrieved person* is given the right to file an action in the district where he resides or has his principal place of business, or where the agency records are situated.

H.R.Rep. No. 1497, *reprinted in* 1966 U.S.C.C.A.N. at 2426. (emphasis added).

This statement reflects Congress's intent to identify the person making the request with the person aggrieved when a request is denied.

Rasmussen, however, points to the legislative history of the 1974 amendments to the FOIA. *See* H.R.Rep. 93–876, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. at 6267. In its letter included in the Appendix to the House bill, DOJ voiced its objections to the proposed amendment awarding attorneys' fees to successful plaintiffs under the FOIA, stating that an award of attorneys' fees is "particularly inappropriate" "in a type of litigation which can be initiated by anyone without the customary legal requirements of standing or interest or injury." H.R.Rep. 93–876, *reprinted in* 1974 U.S.C.C.A.N. at 6280. Rasmussen would have us treat this isolated sentence as a concession by the Government that he need not have signed a FOIA request in order to have standing as a plaintiff in the present action.

Rasmussen's argument is without merit. The fact that Congress ultimately passed the amendment providing for an award of attorneys' fees could alone be interpreted as an implicit rejection of DOJ's premise that the FOIA has no standing requirements. *See* H.R.Rep. 93–876, *reprinted in* 1974 U.S.C.C.A.N. at 6272 (award of attorneys' fees to prevailing FOIA plaintiff desirable when suit advances strong congressional policy); *see also* 5 U.S.C.A. § 552(a)(4)(E) (West 1977) (court may assess against United States reasonable attorney fees and other litigation costs reasonably incurred where FOIA complainant has "substantially prevailed"). Moreover, as discussed above, other portions of the legislative history of § 552 indicate that a person must have submitted a formal request under the FOIA in order to challenge an agency's decision not to release the requested documents.

■ Precedent lends additional support to this requirement. The FOIA "is fundamentally designed to inform the public about agency action...." *N.L.R.B. v. Sears, Roebuck & Co.,* 421 U.S. 132, 144 n. 10, 95 S.Ct. 1504, 1513 n. 10, 44 L.Ed.2d 29 (1975) (citations omitted). A person seeking information under the FOIA therefore need not have

a personal stake in the information sought. Rather, the FOIA

> creates a private cause of action for the benefit of persons who have requested certain records from a public agency and whose request has been denied. 5 U.S.C. § 552(a)(3). The statute requires nothing more than a request and the denial of that request as a predicate to a suit in the district court.

*United States v. Richardson,* 418 U.S. 166, 204, 94 S.Ct. 2940, 2960, 41 L.Ed.2d 678 (1974) (Stewart, J., dissenting). A "case or controversy" conferring standing arises only when a person makes a request for information under the FOIA and the petitioned agency denies that request. *See id.* at 171, 94 S.Ct. at 2943 (Burger, C.J., majority) (judicial power may be exercised only in case properly before court, *i.e.,* "case or controversy" not suffering limitations of political question doctrine, mootness, or calling for advisory opinion) (citing *Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803)). "[A] 'fundamental aspect of standing' is that it focuses primarily on the *party* seeking to get his complaint before the federal court rather than 'on the issues he wishes to have adjudicated.'" *Id.,* 418 U.S. at 174, 94 S.Ct. at 2945 (quoting *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968)). The filing of a request, and its denial, is the factor that distinguishes the harm suffered by the plaintiff in an FOIA case from the harm incurred by the general public arising from deprivation of the potential benefits accruing from the information sought. *See id.,* 418 U.S. at 172, 94 S.Ct. at 2944 (party raising constitutional challenge to statute must show not only invalidity but also that he has sustained or is immediately in danger of sustaining direct injury as result of its enforcement, not merely that he suffers in some indefinite way in common with people generally) (quoting *Frothingham v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923)); *Rushforth v. Council of Economic Advisors,* 762 F.2d 1038, 1039 n. 3 (D.C.Cir.1985) (standing lies as general matter where request is submitted under FOIA for existing documents). In the present case, McDonnell's name alone [6] appears on the requests for records submitted to the FBI and the Navy. He alone pursued the administrative appeals of those agencies' decisions not to release the requested information, the exhaustion of which was a prerequisite to the district court's exercise of subject matter jurisdiction. Accordingly, only McDonnell has standing to pursue this case.

■ Apparently as an equitable matter, Rasmussen also urges that it is imperative he not be dismissed because, if McDonnell should die, the lawsuit would be terminated and the public's right to information about the Morro Castle disaster would be irreparably harmed. The abstract interest of either Rasmussen or the public in the Morro Castle disaster does not change the fact that Rasmussen did not actually make any of the requests which form the basis of this lawsuit.[7] *See Sears,* 421 U.S. at 144 n. 10, 95 S.Ct. at 1513 n. 10 (that requester claims interest in information sought greater than that shared by average member of public neither increases nor decreases rights to access). The district court therefore correctly

**6.** Rasmussen's name appears only once in the flurry of requests for information and appeals by McDonnell that form the basis of this lawsuit. In a letter dated January 8, 1986 and addressed to Anna C. Urband, Media Service Branch, Office of Information, Department of the Navy, McDonnell begins a request for information by stating, "Mr. Fred Rasmussen of The Baltimore Sun and I are researching the tragic burning of the luxury passenger liner, *Morro Castle,* off the New Jersey Coast, 8 [S]eptember 1934." Letter dated Jan. 8, 1986 from Robert J. McDonnell to Anna C. Urband, Appellant's Appendix ("App.") at 194. This passing reference to Rasmussen does not sufficiently identify him with the person making the request to confer on him standing to challenge the denial of the request under the FOIA.

**7.** In a related argument, Rasmussen asserts that as co-author of a book about the Morro Castle incident, his rights to freedom of speech and the press are at stake, and that such rights do not vary with the identity of the speaker or author. *See Simon & Schuster, Inc. v. New York Crime Victims Bd.,* — U.S. —, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). McDonnell likewise asserts various arguments based on the first amendment throughout the briefs. It appears that these arguments have been raised for the first time on appeal. Thus, we need not consider them. To the extent that they are not waived and relevant, they appear to have little, if any, merit. Accordingly, we will not discuss them.

determined that Rasmussen lacked standing to sue.[8] Therefore, in our discussion of the merits of the issues, we will refer to plaintiff McDonnell only.

### C. *Exhaustion of Administrative Remedies*

■ The third and final preliminary issue we must consider is whether McDonnell's action should have been barred for failure to exhaust administrative remedies. McDonnell maintains that he was not required to file an administrative appeal from the Government's failure to respond to those requests before commencing this lawsuit in federal court. Therefore, McDonnell argues that subject matter jurisdiction automatically vested when the Government missed the statutory deadline for responding to his request for certain classes of information.

Before addressing the extent, if at all, that McDonnell's action may be barred by the exhaustion requirement, it is necessary to classify the various categories of information with which we are concerned. McDonnell originally requested information regarding four classes of information: the Black Tom explosion, George Alagna, John B. Duffy, and Oscar Niger. The magistrate judge determined that McDonnell's request for information on the Black Tom explosion was moot because he had not included it in his Supplemental Certification listing all information still sought from the Government. The magistrate judge also noted that at oral argument McDonnell's only response to the Government's assertion that he had failed to exhaust his administrative remedies with regard to Alagna and Duffy was to ask the court to order that any and all information regarding those individuals not be destroyed. On this basis, the magistrate judge concluded that McDonnell had conceded that he had not exhausted his administrative remedies regarding information on Duffy and Alagna.

McDonnell does not specifically appeal from these decisions, although he does characterize the exhaustion issue as involving "the FOIA request for information on Oscar Niger and others...." Brief for Plaintiffs at 17. He also argues that "the inappropriate 'mooting' of issues to arrive at Summary Judgment should be discouraged. If the record does not support Summary Judgment, the case should be set down for trial." *Id.* at 22. McDonnell fails, however, to indicate by reference to the record how summary judgment is precluded other than by his argument that the Navy's assertion that the requested Rogers/Halsey letter was "not found" is ambiguous. The magistrate judge's ruling of failure to exhaust administrative remedies did not extend to information regarding either Rogers or Halsey. It appears, therefore, that this issue affects only McDonnell's request for documents regarding Niger.

McDonnell had requested information about Niger from the FBI on February 2, 1988. On March 1, 1988 the FBI asked McDonnell to furnish "identifying data" and proof of death regarding Niger. On June 28, 1988, the FBI informed McDonnell that his request concerning Niger had been placed in "closed" status because he had not supplied the necessary information. McDonnell filed an administrative appeal from the closing of the file, which DOJ acknowledged it received on July 21, 1988. DOJ affirmed the FBI's closing of the file on March 8, 1989.

Almost one year later, on February 20, 1990, McDonnell supplied the necessary identifying data and proof of death to the United States Attorney's Office in Trenton, New Jersey. The FBI treated this action as reviving McDonnell's original request and ultimately produced some, but not all, of the requested information. McDonnell did not file an administrative appeal from this action. Rather, in a letter dated October 22, 1990, he made an informal request to the magistrate judge for leave to supplement the record to add to his FOIA complaint the Niger files the FBI had refused to produce. The magistrate judge treated this letter as a motion to amend the complaint and denied it on the ground that McDonnell had failed to exhaust his administrative remedies by not filing an

---

8. As a co-author, McDonnell seems to share Rasmussen's interest. There is no indication that McDonnell has failed to adequately protect their common interest and Rasmussen has never sought leave to intervene.

administrative appeal from the FBI's refusal to produce all of the Niger files.

McDonnell appeals from this refusal, arguing that subject matter jurisdiction automatically vested when the FBI failed timely to respond to his initial request for information about Niger on February 2, 1988. Central to this argument is 5 U.S.C.A. § 552(a)(6)(A). Subsection (A)(i) of that statute provides that the agency to which an FOIA request has been submitted must notify the person making the request whether it will comply within ten days after receiving the request. Subsection (A)(ii) imposes a similar twenty-day time limit for the agency to respond after the receipt of an administrative appeal. § 552(a)(6)(A)(ii). Subsection (C) provides that a person making a request shall be deemed to have exhausted his administrative remedies if the agency fails to comply with either deadline. § 552(a)(6)(C).

It is beyond dispute that the FBI did not comply with the ten-day time limit under § 552(a)(6)(A)(i) after McDonnell's initial request for the Niger documents: McDonnell filed that request on February 2, 1988, but the FBI did not respond until March 1, 1988, nearly thirty days later. McDonnell thus argues that "[j]urisdiction is vested in the Court by the passing of the statutory deadline; and need only be invoked by the filing of a complaint.... Nowhere in any authority can plaintiff find any support of the idea that the government can destroy the jurisdiction of the Court by closing its file." Brief for Plaintiffs, at 18–19. The Government responds that McDonnell may not rely on the "automatic" jurisdiction provision of subsection (C) because instead of filing his complaint immediately after the expiration of the ten-day deadline, he waited until after the Government produced at least some of the documents he requested.

The United States Court of Appeals for the District of Columbia Circuit squarely addressed this issue in *Oglesby v. Department of Army,* 920 F.2d 57 (D.C.Cir.1990). It initially noted that the FOIA requires ex-

haustion of the administrative appeals process before an individual may seek relief in the district court. *Id.* at 61 (citations omitted). Nevertheless,

§ 552(a)(6)(C) permits a requester to file a lawsuit when ten days have passed without a reply from the agency indicating that it is responding to his request, but [ ] this option lasts only up to the point that an agency actually responds. Once the agency has responded to the request, the petitioner may no longer exercise his option to go to court immediately. Rather, the requester can seek judicial review only after he has unsuccessfully appealed to the head of the agency as to any denial and thereby exhausted his administrative remedies. Thus, if the agency responds to a FOIA request before the requester files suit, the ten-day constructive exhaustion provision ... no longer applies; actual exhaustion of administrative remedies is required.

*Id.*

█ Thus, if McDonnell had taken no further action after filing this lawsuit in August 1988, his appeal of DOJ's determination upholding the FBI's closing of the Niger file would properly be before this Court. McDonnell, however, revived his request in February 1990 by submitting the necessary information. Whether the FBI timely responded to this request is irrelevant because, even assuming that it failed to do so, McDonnell did not move to amend his complaint to include an appeal from this failure until after the FBI had in fact responded. Under *Oglesby,* once the FBI had responded, McDonnell once again became obligated to pursue his administrative remedies. At no time after he revived his request did McDonnell file an administrative appeal from the withholding of portions of the Niger documents. Therefore, the district court correctly declined to exercise subject matter jurisdiction over McDonnell's FOIA claim regarding the Government's withholding of certain portions of those documents.[9]

Additionally, McDonnell argues that

---

9. The magistrate judge indicated that McDonnell's failure to exhaust his administrative remedies deprived the court of subject matter jurisdiction. This is not exactly correct. A failure to

exhaust administrative remedies does not *per se* deprive the court of subject matter jurisdiction. It is a prudential consideration that the court takes into account in determining whether to

To the extent that the Rules and Regulations of the defendant agencies require plaintiff to take an administrative appeal from an initial denial, or require plaintiff to do more than make an initial valid request for information to begin the running of the statutory time limits; such Rules and Regulations should be determined to be invalid as beyond the reasonable scope of statutory authority provided in 5 USC 552(a)(4).

Brief for Plaintiffs at 19. McDonnell does not elaborate further on this argument.

"Exhaustion of administrative remedies is generally required before filing suit in federal court so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision." *Oglesby,* 920 F.2d at 61 (citation omitted). "Allowing a FOIA requester to proceed immediately to court to challenge an agency's initial response would cut off the agency's power to correct or rethink initial misjudgments or errors." *Id.* at 64. For these reasons, we decline to rule that the requirements embodied in § 552(a)(6) are unreasonable.

### III. *Discussion*

■ Having disposed of all preliminary issues, we turn at last to the merits. In a FOIA case, the district court reviews all agency exemptions *de novo.* 5 U.S.C.A. § 552(a)(4)(B) (West 1977). The burden is on the agency to justify its decision to withhold the requested material. *Id.* The agency may meet this burden by filing affidavits describing the material withheld and detailing why it fits within the claimed exemption. *King v. Department of Justice,* 830 F.2d 210, 217–18 (D.C.Cir.1987). As the United States Court of Appeals for the District of Columbia Circuit has aptly observed,

> The significance of agency affidavits in a FOIA case cannot be underestimated. As, ordinarily, the agency alone possesses knowledge of the precise content of documents withheld, the FOIA requester and

the court both must rely upon its representations for an understanding of the material sought to be protected. As we observed in *Vaughn v. Rosen,* "[t]his lack of knowledge by the party seeing [*sic* ] disclosure seriously distorts the traditional adversary nature of our legal system's form of dispute resolution," with the result that "[a]n appellate court, like the trial court, is completely without the controverting illumination that would ordinarily accompany a lower court's factual determination." Even should the court undertake in camera inspection of the material—an unwieldy process where hundreds or thousands of pages are in dispute—"[t]he scope of the inquiry will not have been focused by the adverse parties...."

Affidavits submitted by a governmental agency in justification for its exemption claims must therefore strive to correct, however imperfectly, the asymmetrical distribution of knowledge that characterizes FOIA litigation. The detailed public index which in *Vaughn* we required of withholding agencies is intended to do just that: "to permit adequate adversary testing of the agency's claimed right to an exemption," and enable "the District Court to make a rational decision whether the withheld material must be produced without actually viewing the documents themselves, as well as to produce a record that will render the District Court's decision capable of meaningful review on appeal." Thus, when an agency seeks to withhold information, it must provide "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply."

*Id.* at 218–19 (footnotes omitted).

■ Because the opposing party (generally the requester) does not ordinarily have the factual information upon which the moving party (generally the agency) has relied, summary judgment in an FOIA case "takes

exercise subject matter jurisdiction. *See Darby v. Cisneros,* — U.S. —, —, 113 S.Ct. 2539, 2543, 125 L.Ed.2d 113 (1993) ("Whether courts are free to impose an exhaustion requirement as a matter of judicial discretion depends, at least in

part, on whether Congress has provided otherwise....") (citing *McCarthy v. Madigan,* — U.S. —, —, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992)).

on a unique configuration." *Lame v. Department of Justice*, 767 F.2d 66, 70 (3d Cir.1985) ("*Lame II*"). As a result, the familiar standard of appellate review promulgated by Federal Rule of Civil Procedure 56(c) [10] does not apply.

 Instead, a two-tiered test governs this Court's review of an order granting summary judgment in proceedings seeking disclosure under the FOIA. The reviewing court must first decide whether the district court had an adequate factual basis for its determination. *Patterson by Patterson v. FBI*, 893 F.2d 595, 600 (3d Cir.), *cert. denied* 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990). (citations omitted) Stated differently, the appellate court

> is to determine, from inspection of the agency affidavits submitted, whether the agency's explanation was full and specific enough to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding.

*King*, 830 F.2d at 217–18.

 If this Court concludes that the affidavits presented a sufficient factual basis for the district court's determination, it must then decide whether that determination was clearly erroneous. *Patterson*, 893 F.2d at 600 (citations omitted); *see King*, 830 F.2d at 218 (clearly erroneous standard governs evaluation of substance of district court's decision once appellate court satisfied that affidavits provided adequate factual basis for decision) (citations omitted). Under the clearly erroneous standard, this Court "may reverse only if the findings are unsupported by substantial evidence, lack adequate evidentiary support in the record, are against the clear weight of the evidence or where the district court has misapprehended the weight of the evidence." *Lame II*, 767 F.2d at 70 (citing Fed.R.Civ.P. 52(a)). The two-tier standard of review of the district court's determination that a particular document is or is not properly subject to exemption does not, of course, preclude plenary review of issues of law. *See*

*id.* at 69 (function of appellate court is to determine whether permissible findings sustain judgment as matter of law). Keeping this standard in mind, we turn to the issues presented on the merits.

## A. *Exemption 1—National Security*

Exemption 1 is commonly referred to as the National Security Exemption. It protects from disclosure matters that are specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy, and are in fact properly classified pursuant to such Executive Order. 5 U.S.C.A. § 552(b)(1) (West 1977).

The parties agree that Executive Order 12,356, 47 Fed.Reg. 14874 (1982), controls in this case. That Order "prescribes a uniform system for classifying, declassifying, and safeguarding national security information." *Id.* The Order recognizes the tension between the people's interest in being informed about governmental activities with the countervailing interest of the United States and its citizens in preventing unauthorized disclosure of certain information concerning national defense and foreign relations. *Id.* It seeks to balance these competing interests by requiring "[i]nformation [ ] not be classified under this Order unless its disclosure reasonably could be expected to cause damage to the national security." *Id.; see United States Student Assoc. v. Central Intelligence Agency*, 620 F.Supp. 565, 568–69 (D.D.C.1985) (court must determine whether agency has withheld information properly pursuant to National Security Exemption).

The standard for determining whether an agency properly withheld documents under Exemption 1 is somewhat different from that applied to documents withheld under other FOIA exemptions:

> Because " '[e]xecutive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result

---

**10.** In a typical review of an order granting summary judgment, this Court employs the same standard as the district court and will affirm if (1) there is no genuine issue as to any material fact in dispute, and (2) the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *see Lame II*, 767 F.2d at 70.

of public disclosure,'" ... courts are required to "'accord substantial weight to an agency's affidavit concerning the details of the classified status of a disputed record.'" *Salisbury v. United States*, 690 F.2d 966, 970 (D.C.Cir.1982) (quoting S.Rep. No. 1200, 93d Cong.2d Sess. 12 (1974), U.S.Code Cong. & Admin.News (1974) pp. 6267, 6290).

*American Friends Serv. Comm. v. Department of Defense*, 831 F.2d 441, 444 (3d Cir. 1987) (citing *Abbotts v. Nuclear Regulatory Comm.*, 766 F.2d 604, 606 (D.C.Cir.1985)). For these reasons, an agency is entitled to summary judgment if its affidavits (1) "describe the withheld information and the justification for withholding with reasonable specificity, demonstrating a logical connection between the information and the claimed exception," *id.* at 444 (quoting *Salisbury,* 690 F.2d at 970), and (2) "are not controverted by either contrary evidence in the record or evidence of agency bad faith." *Id.* (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C.Cir.1981)). The Government bears the burden of demonstrating "that the withheld material is under the purview of an Executive Order and has been properly classified pursuant to such order." *Patterson v. FBI*, 705 F.Supp. 1033, 1039 (D.N.J.1989), *aff'd* 893 F.2d 595 (3d Cir.), *cert. denied*, 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990).

### 1. *Documents Relating to Cryptographic Systems*

█ McDonnell argues that the district court erred in granting summary judgment to the FBI on its claim that it was entitled to withhold five documents from production under Exemption 1 because they relate to FBI cryptographic systems. *But See* Exec. Order 12,356, 47 Fed.Reg. 14874 § 1.3(a)(8) (1982) (establishing that information shall be considered for classification if it concerns cryptology). In support of this claim, the FBI supplied the Whaley Declaration,[11] which describes the substance of the redacted documents as follows:

> [T]he portions marked for classification contain information of the type identified by the Executive Order as being subject to classification. Release of this information could reasonably be expected to cause damage to the national security.... Specific dates and words or comments relating to cryptographic material, that could help pinpoint exact areas of vulnerability, have been deleted to protect bureau code systems in use during a specific time frame.

App. at 81. The Declaration also describes the nexus between the disclosure of this information and the asserted damage to national security:

> The basic concern is whether a hostile entity having access to both the plaintext and ciphertext versions of a Bureau message would have the capability to decrypt other messages enciphered with the same cryptographic key. If as described above, a hostile entity achieves the capability to decrypt messages enciphered with the same cryptographic key in a certain time frame, then all FBI classified information within that time frame, regardless of its nature, is susceptible to disclosure to the detriment of national security.

*Id.* at 82.

The district court relied on these portions of the Whaley Declaration to establish the description of the withheld information and its nexus to national security as required by *American Friends*. After determining that McDonnell had introduced insufficient evidence to rebut this nexus, the magistrate judge recommended granting the FBI's motion for summary judgment under Exemp-

---

11. The Whaley Declaration identifies these documents as:

Memorandum For the Director
Dated September 14, 1934
File Number 45–833, serial 20
Incoming Telegram
Dated September 16, 1934
File Number 45–833, serial 37
Outgoing Communication
Dated September 20, 1934

File Number 45–833, serial 37 (Serial number is the same as on incoming Telegram dated September 16, 1934)
Memorandum For Mr. Tamm
Dated September 26, 1934
File Number 45–833, serial 49
Report at New York City
Dated October 13, 1934
File number 45–833, serial 73
App. at 80.

tion 1 and the district court accepted this recommendation.

McDonnell concedes that the material requested was properly classified as exempt in 1934. He nevertheless argues that it is no longer entitled to such status because of the passage of time. *See, e.g.,* 28 C.F.R. § 17.6 (1992) (precluding classification for any longer than necessary for national security interests). Thus, he argues that the Government should justify factually how national security interests will be affected by divulgence of the withheld information.

The Government's response to this argument is that it is concerned not so much with maintaining the secrecy of the underlying message that the code conceals, but instead with maintaining the secrecy of the cryptology itself. As the Whaley Declaration stated, the Government's purpose in withholding this information is to preclude study of the FBI's cryptographic systems by any hostile person or entity. The Government elaborated on this statement at oral argument, explaining that divulgence of coded documents could enable hostile entities to interpret other, more sensitive documents similarly encoded. *See Keys v. Department of Justice,* 830 F.2d 337, 348 (D.C.Cir.1987) (mere passage of time does not remove justifications for classification). Given the "substantial weight" courts are instructed to give an agency's affidavit concerning details of the classified status of disputed records, *see American Friends Serv. Comm. v. Department of Defense,* 831 F.2d 441, 444 (3d Cir.1987), the district court did not err in upholding the Government's refusal to release the five documents at issue under Exemption 1.

### 2. *Request for Translated Copies of Encoded Documents*

 As a corollary argument, McDonnell asserts that the district court erred in refusing to order the Government to provide translated copies of the coded material to him at his own expense. Though it is true that cryptology is subject to classification under Exemption 1, he asserts this does not mean that anything coded is exempt. Therefore, he asks the Government to translate anything in code that would otherwise be available if not encoded.

The Government resists, arguing that the translation of the requested material, if not exempt, would require the creation of a new record, and that an agency is not required to create records in order to respond to FOIA requests. *See NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 162, 95 S.Ct. 1504, 1522, 44 L.Ed.2d 29 (1975). Because there is a procedure for periodic review of cryptologic information, *see, e.g.,* Exec.Order 12,356, 47 Fed. Reg. 14874 § 1.4 (1982) (regarding duration of classification), McDonnell responds that the Government would have had to translate the coded information at some time to determine whether it was still subject to classification. Accordingly, he argues, the Government would not be required to create any new documents other than those it would have to create in any event.

We recognize the principle that an agency is not required to create records in order to respond to FOIA requests. *Sears,* 421 U.S. at 162, 95 S.Ct. at 1522; *Yeager v. DEA,* 678 F.2d 315, 321–23 (D.C.Cir.1982); *Krohn v. Department of Justice,* 628 F.2d 195, 197–98 (D.C.Cir.1980). Nevertheless, we are not persuaded that translation of existing documents would be tantamount to imposing on the Government the burden of creating records. Moreover, as McDonnell points out, the requested document may already exist in translated form, in which case the only burden on the Government would be one of production.

Despite these observations, the same national security concerns that are material to disclosing coded documents would come into play were the Government required to disclose translated copies of those documents. As discussed above, the Government wishes to withhold this information in order to preclude study of the FBI's cryptographic systems by a hostile entity. If the Government released translated copies of documents already in the possession of a hostile person or entity, the translation could provide a key to interpretation of other, more sensitive documents similarly encoded. Indeed, it might serve this purpose better than production of the coded documents themselves would. The

district court did not err in refusing to compel the Government to produce translated copies of the documents it withheld under Exemption 1.

### 3. *Burden of Proof*

 McDonnell also argues that the district court erroneously placed the burden upon him, instead of the Government, to establish whether or not a given document was classified. Specifically, McDonnell objects to language in the magistrate judge's report and recommendation dismissing as "conjecture" his theory that the requested information was withheld because of "[n]ational [e]mbarrassment, not [n]ational [s]ecurity." App. at 397.

Under section 1.6(a) of Executive Order 12,356, information may not be withheld for the sole purpose of preventing embarrassment to an agency. McDonnell postulated that the real reason the FBI was withholding the five documents at issue was in order to prevent embarrassment stemming from the transportation of arms to revolutionary Cuba aboard a passenger ship. The magistrate judge noted that the only evidence McDonnell had supplied to support this theory was that certain documents indicated that the customs officer in Cuba was not to be interviewed, and that Exemption 1 was invoked in conjunction with the notation "Referred to Customs." The magistrate judge concluded that McDonnell had failed to carry his burden of proof insofar as he sought to bring his discovery requests within section 1.6(a), declaring, "Parties must be required to supply some basic facts and evidence, or we will fall prey to the creative plaintiff who can conjure up endless unsupported theories in order to fall within the confines of Executive Order 12356 § 1.6(a)." App. at 397 (footnote omitted).

This isolated statement, taken out of context, does not indicate that the court placed on McDonnell the burden of demonstrating "that the withheld material is under the purview of an Executive Order and has been properly classified pursuant to such order." *Patterson*, 705 F.Supp. at 1039. This is undeniably the Government's burden. Instead, the court made this remark in reference to McDonnell's attempt to bring his request for coded documents within section 1.6(a). The report and recommendation clearly shows that the magistrate judge looked to the Government for proof of classification and became satisfied, as we are, that the Government carried its burden before turning to McDonnell. The only passage which McDonnell cites in his brief as indicating otherwise,[12] dealt with his claims regarding the Niger documents. As discussed above, those claims were properly dismissed because McDonnell failed to exhaust his administrative remedies concerning their release. We agree with the district court that McDonnell produced insufficient evidence to create a disputed issue of material fact regarding his theory of an arms coverup. Therefore, the district court did not err in adopting the magistrate judge's recommendation on this point.

### 4. *Classification in Anticipation of Litigation*

 Finally, McDonnell urges that the Government classified the withheld information in anticipation of litigation, but he points to no evidence to support this argument. Even if this is so, an agency may classify or reclassify information after it has received a request for it under the FOIA if that classification meets the requirements of Executive Order 12,356 and is accomplished personally and on a document-specific basis by an official with original Top Secret classification authority. Exec.Order 12,356, 47 Fed.Reg. 14874 § 1.6(d) (1982). We have already determined that the five withheld documents identified were properly classified under Executive Order 12,356 by Whaley, an official holding the requisite classification authority.

---

12. The passage which McDonnell cites to in the report and recommendation states in a footnote. It has also been brought to this Court's attention that "the Niger documents were declassified on July 19, 1990." See Plaintiff's October 22, 1990 letter. Plaintiff makes this bald statement without providing any documentation or supporting information. Without more information, the Court is unable and unwilling to make any recommendation regarding the supposed declassification of the Niger documents. App. at 389.

Accordingly, McDonnell's argument that these documents should be released because they were classified in anticipation of litigation has no merit.

## B. *Exemption 3—Statutory Exception*

■. Under Exemption 3, an agency may withhold matters "specifically exempted from disclosure by statute," other than the FOIA, if that statute either "(A) requires that the matter be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C.A. § 552(b)(3); *see American Jewish Congress v. Kreps*, 574 F.2d 624, 628 (D.C.Cir.1978) (statute falls within Exemption 3 if it satisfies either one of disjunctive requirements lettered "(A)" and "(B)"). Exemption 3 differs from the other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents. *Association of Retired R.R. Workers v. United States R.R. Retirement Bd.*, 830 F.2d 331, 336 (D.C.Cir. 1987). Instead, the sole issues for decision in determining the applicability of Exemption 3 to a particular set of documents are the existence of either type of relevant statute and the inclusion of withheld material within the statute's coverage. *Id.*

The Government invoked Exemption 3 to preclude disclosure of requested material under two separate statutes: Federal Rule of Criminal Procedure 6(e), which applies to matters occurring before a grand jury, and 18 U.S.C.A. § 5038 (West 1985), which applies to juvenile records. We will address the applicability of each of statute to the requested documents in turn.

## 1. *Grand Jury Material*

Federal Rule of Criminal Procedure 6 governs federal grand jury proceedings. Fed.

R.Crim.P. 6 Section (d) of that rule limits the persons who may be present while a grand jury is in session to attorneys for the government, the witness under examination, interpreters if needed, and the stenographer or operator of a recording device. Fed. R.Crim.P. 6(d). Section (e)(2) imposes a general rule of secrecy on all persons who are present pursuant to section (d) except witnesses before the grand jury.[13] *See Butterworth v. Smith*, 494 U.S. 624, 629–36, 110 S.Ct. 1376, 1379–83, 108 L.Ed.2d 572 (1990). Specifically, this section provides that all persons listed "shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules." Fed. R.Crim.P. 6(e)(2).

The Government invoked Rule 6(e)(2) to preclude disclosure of three categories of information: (1) Information and records presented to a federal grand jury concerning the Morro Castle, its crew, and its passengers; (2) names of individuals subpoenaed; and (3) federal grand jury transcripts of testimony. The magistrate judge agreed that the names of individuals subpoenaed and transcripts of testimony, by definition, included matters before the grand jury and thus constituted a sufficient basis for withholding under Rule 6(e) and Exemption 3. The court reached the same conclusion with regard to the information and records presented to the grand jury concerning the Morro Castle, its crew, and its passengers after conducting an *in camera* inspection of this information.

Rule 6(e) has been held to satisfy the requirements of Exemption 3:

The rule makes quite clear that disclosure of matters occurring before the grand jury is the exception and not the rule. It further sets forth in precise terms to whom, under what circumstances and on what conditions grand jury information may be

---

**13.** Rule 6(e)(2) also imposes a rule of secrecy on any typist who transcribes recorded grand jury testimony and any government personnel to whom a court has ordered disclosure under subsection (e)(3)(A)(ii), which provides,

Disclosure otherwise prohibited by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand juror, may be made to—

(ii) such government personnel (including personnel of a state or subdivision of a state) as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law.

Fed.R.Crim.P. 6(e)(3)(A)(ii).

disclosed. Any disclosure to persons outside of the government may only be made pursuant to a court order. Fed.R.Crim.P. 6(e)(3)(C). Therefore, the rule's ban on disclosure is for FOIA purposes absolute and falls within subpart (A) of Exemption 3. *See American Jewish Congress v. Kreps,* 574 F.2d 624, 628 (D.C.Cir.1978).

*Fund for Constitutional Gov't v. National Archives,* 656 F.2d 856, 868 (D.C.Cir.1981).

■ McDonnell apparently concedes that Rule 6(e) constitutes a statute specifically exempting material from disclosure. He nevertheless argues that Rule 6(e) does not establish an absolute ban on disclosures within the meaning of subsection (A) of Exemption 3 because the plain language of that rule gives a court discretion to decide whether grand jury material falls within the general rule of secrecy. Instead, he argues, Rule 6(e) falls under subsection (B) of Exemption 3, which encompasses statutes establishing particular criteria for withholding or referring to particular types of matters to be withheld. Accordingly, McDonnell asserts, the district court should have conducted a factual inquiry regarding whether the grand jury material at issue fell within the scope of the rule of secrecy under Rule 6(e)(2).

McDonnell bases this argument on Rule 6(e)(3)(E), which establishes a procedure for disclosure in cases in which "the judicial proceeding giving rise to the petition is in a federal district court in another district." Fed.R.Crim.P. 6(e)(3)(E). In such cases,

> [T]he court shall transfer the matter to that court unless it can reasonably obtain sufficient knowledge of the proceeding to determine whether disclosure is proper. The court shall order transmitted to the court to which the matter is transferred the material sought to be disclosed, if feasible, and a written evaluation of the need for continued grand jury secrecy. The court to which the matter is transferred shall afford the aforementioned persons a reasonable opportunity to appear and be heard.

*Id.*

■ The plain language of this subsection establishes guidelines for transferring grand jury materials between district courts only when disclosure is otherwise permitted. It does not, in and of itself, establish an exception to the general rule of secrecy upon which the Government relied to withhold the requested information. Before a court must evaluate the need for continued secrecy under subsection (e)(3)(E), the party seeking disclosure must establish that the grand jury material sought falls within one of the six exceptions to the general rule of secrecy enumerated in Rule 6(e)(3)(A)(C). *See Fund for Constitutional Gov't,* 656 F.2d at 868. Under subsection (e)(3), disclosure otherwise prohibited by Rule 6(e)(2) of matters occurring before the grand jury may be made: (1) To a government attorney for use in the performance of his duty. Fed.R.Crim.P. 6(e)(3)(A)(i); (2) to such government personnel as a government attorney deems necessary to assist him in the performance of his duty to enforce federal criminal law, *id.* 6(e)(3)(A)(ii); (3) when so directed by a court preliminarily to or in connection with a judicial proceeding, *id.* 6(e)(3)(C)(i); (4) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury, *id.* 6(e)(3)(C)(ii); (5) when disclosure is made by a government attorney to another federal grand jury, *id.* 6(e)(3)(C)(iii); and (6) when permitted by a court at the request of an attorney for the government, upon a showing that such matters may disclose a violation of state criminal law, to an appropriate official of a state or subdivision of a state for the purpose of enforcing such law, *id.* 6(e)(3)(C)(iv).

The first two exceptions involve disclosure to government attorneys and other government personnel. *See* Rule 6(e)(3)(A)(i), (ii). These exceptions have no application to this case because McDonnell fits neither of these descriptions.

The remaining four exceptions are found under subsection (e)(3)(C). McDonnell does not cite any of them as applicable, and the only one of them that could conceivably apply is (e)(3)(C)(i). It permits disclosure when a court so directs preliminarily to or in connection with a judicial proceeding. It is well

established, however, that a FOIA plaintiff may not obtain disclosure by relying on Rule 6(e)(3)(C)(i) as an exception to the general rule of secrecy under Rule 6(e)(2), because "an examination of the language and legislative history of [6(e)(3)(C)(i) ] reveals that it contemplates disclosure in the course of parallel civil proceedings and 'does not include the very proceeding instituted for the purpose of obtaining disclosure.' " *Fund for Constitutional Gov't,* 656 F.2d at 868 (quoting *Hiss v. Department of Justice,* 441 F.Supp. 69, 70 (S.D.N.Y.1977)). McDonnell's request for disclosure is not related to any parallel civil proceeding other than the present one to compel disclosure. The district court did not have to determine *in camera* if there was a need for continued grand jury secrecy because McDonnell's request did not fall within any of the exceptions to the general rule of secrecy under Rule 6(e)(2).

Alternatively, McDonnell contends that even if Rule 6(e) falls within subsection (A) of Exemption 3, the district court was still required to "apply a factual balancing test for release under Rule 6(e)." In support of this position, McDonnell cites *In re Grand Jury Matter,* 682 F.2d 61, 64 n. 5 (3d Cir.1982); *Fund for Constitutional Gov't,* 656 F.2d at 867; *Church of Scientology v. Department of Army,* 611 F.2d 738, 742 (9th Cir.1979); and *Ferri v. United States Dept. of Justice,* 573 F.Supp. 852 (W.D.Pa.1983). None of the cited cases support the proposition that a district court has to apply any sort of factual balancing test when the request for disclosure does not otherwise fall within one of the Rule 6(e)(2)'s exceptions to the general rule of secrecy. *See, e.g., Ferri,* 573 F.Supp. at 857 (government not required to produce indexing of grand jury transcripts where transcripts are clearly exempt from disclosure under Rule 6(e)(2) and Exemption 3 and do not otherwise fall within exceptions under Rule 6(e)(3)). Some of the cited cases actually undercut McDonnell's argument. *See, e.g., Grand Jury Matter,* 682 F.2d at 63–64 (balancing of secrecy requirement with need for grand jury transcripts required only where exception to secrecy rule applicable); *Church of Scientology,* 611 F.2d at 742 (court may exercise discretion to conduct *in camera* examination of documents for determination of

exempt status when government affidavits or testimony are too generalized to otherwise establish eligibility).

■ Even so, here the magistrate judge did conduct an *in camera* inspection of the information and records concerning the Morro Castle, its crew, and its passengers, and verified that this information had in fact been presented to the grand jury and thus was not subject to disclosure under Rule 6(e)(2) and Exemption 3. *See Grand Jury Matter,* 682 F.2d at 63 (Rule 6(e) secrecy applies not only to information drawn from transcripts of grand jury proceedings, but also to anything that may reveal what occurred before grand jury; both direct and indirect disclosure of information are proscribed). The magistrate judge likewise determined that the names of individuals subpoenaed and the transcripts of testimony before the grand jury were not subject to disclosure. *See Fund for Constitutional Gov't,* 656 F.2d at 869 (names and identities of witnesses, substance of testimony, and documents considered by grand jury fall within broad reach of grand jury secrecy) (citing *SEC v. Dresser Indus.* 628 F.2d 1368, 1382 (*en banc cert. denied,* 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980)). The district court then correctly decided that each of these three categories of information would reveal matters occurring before the grand jury and are therefore properly exempt from disclosure pursuant to Rule 6(e) and Exemption 3.

■ McDonnell next points to 28 U.S.C.A. § 1868 as permitting identity of grand jurors to be made a matter of public record upon court order after a mandatory four-year period. The plain language of this statute, however, limits disclosure "for public inspection for the purpose of determining the validity of the selection of any jury." 28 U.S.C.A. § 1868 (1993). This is not the reason for which McDonnell seeks disclosure, and so he may not rely on § 1868.

■ McDonnell also relies on 18 U.S.C.A. § 3333(a), (b). This statute provides for public disclosure by the district court, with the concurrence of the grand jury, of reports concerning: (1) noncriminal misconduct, malfeasance, or misfeasance in office by an ap-

pointed public officer or employee as the basis for a recommendation of, removal or disciplinary action; or (2) organized crime conditions in the district. Neither of these circumstances is implicated here, so § 3333(a) does not help McDonnell.

The Government has carried its burden of showing that the requested information fell within Exemption 3. Accordingly, the district court did not err in refusing to order disclosure of the three categories of grand jury materials McDonnell requested.[14]

## 2. Juvenile Records

▮ The Government relied on 18 U.S.C.A. § 5038 to withhold juvenile records pertaining to George White Rogers. This section provides that "[t]hroughout and upon the completion of the juvenile delinquency proceeding, the records shall be safeguarded from disclosure to unauthorized persons[,]" subject to certain enumerated exceptions not at issue here. 18 U.S.C.A. § 5038(a) (1993). The district court held that § 5038 exempts from disclosure certain information and establishes particular criteria for withholding such matters, and so meets the requirements of subsection (B) of Exemption 3. *See* 5 U.S.C.A. § 552(b)(3)(B) (1977).

McDonnell apparently concedes that § 5038 is a statute within the meaning of Exemption 3. He nevertheless argues that Rogers' juvenile records do not fall within the scope of § 5038 because they were state, rather than federal, records, and so § 5038 does not constitute a bar to disclosure. The Government, on the other hand, argues that McDonnell's rights are predicated on the fact that the records he seeks are maintained by a federal government agency, and thus his right to disclosure is governed by federal, not state, law. In response, McDonnell argues in the alternative, that even if Rogers' records fall within the scope of § 5038, they are no longer properly withheld because they are over seventy years old and Rogers has been dead since 1958.

▮ The Government is correct in its assertion that McDonnell's right to disclosure under Exemption 3 of the FOIA is governed by federal law. *See American Jewish Congress v. Kreps*, 574 F.2d 624, 628 (D.C.Cir. 1978) ("unmistakable thrust" of Exemption 3 "is to assure that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch") (footnote omitted). Nevertheless, the Government bears the burden of establishing that the withheld material falls within the scope of the federal statute upon which it relies. *See Anderson v. Department of Health & Human Servs.*, 907 F.2d 936, 941 (10th Cir.1990) (citing *Alirez v. NLRB*, 676 F.2d 423, 425 (10th Cir.1982)). Section 5038 establishes a policy for nondisclosure of juvenile records upon completion of "the juvenile delinquency proceeding." 18 U.S.C.A. § 5038(a) (West 1993). Section 5031 defines "juvenile delinquency" as a "violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." *Id.* § 5031. Section 5032 establishes procedures to determine delinquency proceedings in federal district court. *See id.* § 5032. Read in the context of these sections, the phrase "juvenile delinquency proceeding" in section 5038(a) is clearly a reference to a federal delinquency proceeding. Because Rogers' juvenile records are state juvenile records, they do not fall within the scope of § 5038.

We recognize that this construction could result in the disclosure of state juvenile records in the hands of a federal agency served with a FOIA request that would be nondisclosable under applicable state law. *See Davidson v. Georgia*, 622 F.2d 895, 897 (5th Cir.1980) (FOIA has no application to state governments) (citing 5 U.S.C.A. §§ 551, 552). Still, other FOIA exemptions, in different circumstances, may justify the withholding of state juvenile records where Exemption 3 does not apply. For example, the court in *Reporters Committee v. United States Department of Justice*, 816 F.2d 730 (D.C.Cir.),

---

**14.** McDonnell does not argue that the expiration of time lifts the shroud of secrecy that hides grand jury matters. Moreover, the magistrate judge's order that the Government produce information regarding persons whom it determines to be deceased does not apply to information withheld pursuant to Exemption 3, as discussed below.

*modified,* 831 F.2d 1124 (D.C.Cir.1987), *rev'd on other grounds,* 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), held that the government could not withhold an FBI "rap sheet"[15] under Exemption 3 because the statute on which the government relied, 28 U.S.C.A. § 534,[16] was not a statute that specifically exempts matters from public disclosure. *Id.* at 735. The court also held that the document in question, a rap sheet, was not properly withheld under Exemption 6 relating to personnel, medical, and similar files, *id.; see* 5 U.S.C.A. § 552(b)(6); or Exemption 7(C), which exempts from disclosure "records or information complied for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to constitute an unwarranted invasion of personal privacy[.]" 5 U.S.C.A. § 552(b)(7)(C) (West Supp.1993); *see Reporters Comm.,* 831 F.2d at 1126–27.

The Supreme Court granted certiorari and reversed the United States Court of Appeals for the District of Columbia Circuit's decision insofar as it held that Exemption 7(C) was inapplicable to the withholding of the rap sheet. In this connection, the Supreme Court explained, "although perhaps not specific enough to constitute a statutory exemption under FOIA Exemption 3 ... these

statutes and regulations [governing the circumstances under which the government may disseminate rap sheets], taken as a whole, evidence a congressional intent to protect the privacy of rap-sheet subjects, and a concomitant recognition of the power of compilations to affect personal privacy that outstrips the combined power of the bits of information contained within." *Reporters Comm.,* 489 U.S. at 765, 109 S.Ct. at 1477 (footnote omitted). The Government in the present case has not asserted that Rogers' juvenile records are exempt from disclosure under Exemption 7(C) or any other FOIA exemption, so the question whether another exemption would justify withholding the records is not before us.[17]

Although the applicability of Exemption 3 does not turn on the substance of the matter withheld, we also believe that even if § 5038 were applicable, disclosure under the circumstances of the present case would seem to cause no harm either to Rogers or current juvenile policy. The prohibition in § 5038 against the release of sealed juvenile records is not absolute. The exceptions to that prohibition were enacted with the expectation that the person to whom otherwise sealed records are released will use the material contained therein for the limited purposes

---

**15.** A "rap sheet," or identification records, is a FBI record on an individual whose fingerprints have been submitted to the FBI in connection with arrests and, in certain instances, employment, naturalization and military service. *Reporters Committee,* 816 F.2d at 732 n. 2 (citing 28 C.F.R. § 16.31 (1986)). A rap sheet typically includes information concerning an individual's arrests, indictments, convictions, and imprisonment, and a notation of the source of the information. *Id.* Thus, it is somewhat similar to what one might expect to be contained in a person's juvenile delinquency records.

**16.** That statute provides in pertinent part,
 (a) The Attorney General shall—
 (1) acquire, collect, classify, and preserve identification, criminal identification, crime and other records;
 . . . .
 (4) exchange such records and information with, and for the official use of, authorized officials of the Federal Government, the States, cities, and penal and other institutions.
 (b) The exchange of records and information authorized by subsection (a)(4) of this section is subject to cancellation, if dissemination is

made outside the receiving departments or related agencies.
28 U.S.C.A. §§ 534(a)(1), (4), (b) (West 1982).

**17.** It is, however, noteworthy that Rogers died in 1956, almost forty years ago, and his juvenile record spans a decade from 1911 to 1922. Although a court reviewing an agency's withholding under Exemption 3 does not balance the privacy interest of the subject of the documents, as it should in applying Exemption 7(C), any privacy interest implicated by disclosure of Rogers' juvenile records would be extremely weak under this circumstance.

It is also noteworthy that in *Reporters Committee,* the FBI released the rap sheet of one subject who was deceased at the time it received the FOIA request for disclosure, although it later described that release as a mistake. *See* 816 F.2d at 732. At a later date, after the requesters had filed suit, the FBI offered to release the rap sheets and other criminal information in its possession regarding two other subjects who were alive at the time of the initial request but who had died during the pendency of the lawsuit. *See id.* at 733.

authorized in the statutory statement creating the exceptions.[18] These exceptions, in turn, are primarily consistent with the concern of preventing undue public disclosure of the juvenile's identity. *United States v. Chacon,* 564 F.2d 1373, 1375 (9th Cir.1977). That concern is not present here because Rogers has been dead since 1956.

The basic purpose of the FOIA "is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978) (citations omitted). "To achieve that goal, the FOIA is designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Anderson,* 907 F.2d at 941 (quotations and citations omitted). The FOIA is to be broadly construed in favor of disclosure, and its exemptions are to be narrowly construed. *Id.* (citing *Alirez,* 676 F.2d at 425); *Irons & Sears v. Dann,* 606 F.2d 1215, 1219 (D.C.Cir. 1979), *cert. denied,* 444 U.S. 1075, 100 S.Ct. 1021, 62 L.Ed.2d 757 (1980). Broadly construing § 5038 as exempting from disclosure state juvenile delinquency records for FOIA purposes would turn the rules of FOIA construction on their head and thwart the very purpose of the statute. The district court erred in holding that Rogers' juvenile records were within the scope of § 5038 and granting summary judgment to the Government on that ground.

### C. *Exemption 6—Personnel and Medical Files*

█ McDonnell argues that the district court erred in allowing the Government to rely on Exemption 6 to withhold medical information located in the personnel record of an undisclosed individual in the Morro Castle file. Exemption 6 exempts from disclosure "personnel and medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C.A. § 552(B)(6) (West 1977). McDonnell does not dispute that the information he seeks is in "personnel and medical files and similar files" that meet the threshold requirement of Exemption 6. *See Department of State v. Washington Post Co.,* 456 U.S. 595, 599–602, 102 S.Ct. 1957, 1960–62, 72 L.Ed.2d 358 (1982) ("similar files" covers all information that "applies to a particular individual"); *see also Department of State v. Ray,* —— U.S. ——, —— – ——, 112 S.Ct. 541, 546–47, 116 L.Ed.2d 526 (1991); *Reed v. NLRB,* 927 F.2d 1249, 1251 (D.C.Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992). Instead, he argues that release of this material would not be a "clearly unwarranted invasion of personal privacy" because of the age of the file.

In approving the Government's reliance on Exemption 6, the magistrate judge followed the analysis set forth in *I.B.E.W. Local Union No. 5 v. Department of Housing & Urban Development,* 852 F.2d 87, 89 (3d Cir. 1988). This analysis

> requires us to determine whether the information sought is subject to privacy protection and, if so, whether the invasion of privacy is "clearly unwarranted." This inquiry involves a balancing of the public interest served by disclosure against the harm resulting from the invasion of privacy. In striking this balance, the court must keep in mind that there is a presumption in favor of disclosure. [*United States Dep't of Navy v. FLRA,*] 840 F.2d

---

18. Section 5038 provides that juvenile delinquency records "shall be released to the extent necessary to meet the following circumstances:"
 (1) inquiries received from another court of law;
 (2) inquiries from an agency preparing a presentence report for another court;
 (3) inquiries from law enforcement agencies where the request for information is related to the investigation of a crime or a position within that agency;
 (4) inquiries, in writing, from the director of a treatment agency or the director of a facility to which the juvenile has been committed by the court;
 (5) inquiries from an agency considering the person for a position immediately and directly affecting the national security;
 (6) inquiries from any victim of such juvenile delinquency, or if the victim is deceased from the immediate family of such victim, related to the final disposition of such juvenile by the court in accordance with section 5037.
 18 U.S.C.A. § 5038(a)(1)–(6).

[1131,] 1135 [ (3d Cir.1988) ]. In addition, the agency bears the burden of proving an exemption from the disclosure requirements. *Committee on Masonic Homes of R.W. Grand Lodge v. NLRB,* 556 F.2d 214, 218–20 (3d Cir.1977).

*Id.*

First, the magistrate judge identified the privacy interest at stake as the potential harassment, criticism, and embarrassment of the person who is the subject of the records. In making this determination, the court relied on the Government's representations that

> the disclosure of this medical information could violate the "clearly unwarranted invasion of personal privacy" standard of this exemption. In making a determination regarding disclosure of this material, the public's right to know was weighed against the individual's right to privacy. The potential harassment, criticism, and embarrassment of this person, would far outweigh the minimal public interest in the records and/or his identity and would thus be a clearly unwarranted invasion of his personal privacy.

App. at 56.

Second, the magistrate judge identified the public interest in disclosure. McDonnell filed an affidavit opposing the withholding on grounds that the Government had "inconsistently applied" Exemption 6. The magistrate judge determined that inconsistent application did not constitute a public interest in disclosure of the withheld information, noting that McDonnell had failed to identify how release would benefit the public in any particular substantive way. The magistrate judge nevertheless surmised, because McDonnell is writing a book, "the more information received, the better informed the public will be." App. at 404.

Proceeding to the final step in the analysis, the magistrate judge in balancing the privacy interest against the public interest concluded that McDonnell had failed to overcome the substantial privacy interests involved. The district court adopted this conclusion and granted summary judgment in favor of the Government on its decision to withhold the information in this individual medical and personnel file under Exemption 6.

McDonnell argues that the old age of the file and the possibility that the person who is the object of the file is dead negate any privacy interest that person may have or have had in the withheld information. The Government indicates in its brief that it has included the individual identified in this file in the search through its files the district court ordered to determine whether "the individuals being 'protected' by Exemption 7(C) are still living." Given the similarity of the balance of interests analyses under Exemptions 6 and 7(C), *see Landano v. Department of Justice,* 956 F.2d 422, 426 (3d Cir. 1992) (detailing analysis for unwarranted invasion of personal privacy under Exemption 7(C)), *vacated in part on other grounds and remanded,* —— U.S. ——, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993), we agree with the Government that although the district court's order was technically limited to Exemption 7(C), it logically encompasses the single individual whose records the Government seeks to withhold under Exemption 6 as well.

Despite the Government's assertion that it has conducted this search, it does not indicate whether the individual who is the subject of the Exemption 6 withholding is still living. Instead, it relies on the Supreme Court's statement in *Reporters Committee* that "the question of public interest must turn on the nature of the requested document and its relationship to the basic purpose of the [FOIA] to 'open agency action to the light of public scrutiny,'" that is, "to let the citizenry know what their government is up to." *Landano,* 956 F.2d at 428 (quoting *Reporters Comm.,* 489 U.S. at 772–73, 109 S.Ct. at 1481). Because disclosure of an individual's medical files would not advance the FOIA's goal of permitting public scrutiny of agency action, the Government reasons, McDonnell is not entitled to disclosure.

[28] Although *Reporters Committee* dealt with Exemption 7(C)'s exclusion of records or information compiled for law enforcement purposes to the extent that their production could reasonably be expected to constitute an unwarranted invasion of personal privacy, its pronouncements regarding the purpose of

the FOIA are equally applicable here, particularly given the similar balancing of interests analysis applicable to both Exemption 6 and Exemption 7(C). Specifically, *Reporters Committee* recognized "that disclosure of records regarding private citizens, identifiable by name, is not what the framers of the FOIA had in mind." 489 U.S. at 765, 109 S.Ct. at 1478. When a person requesting information under the FOIA seeks records of an inherently private nature, the propriety of disclosure under Exemption 6 depends on whether their revelation would be "a clearly unwarranted invasion of personal privacy." 5 U.S.C.A. § 552(b)(6). Likewise, "whether an invasion of privacy is *warranted* cannot turn on the purposes for which the request for information is made." *Reporters Comm.,* 489 U.S. at 771, 109 S.Ct. at 1480. Congress " 'clearly intended' the FOIA 'to give any member of the public as much right to disclosure as one with a special interest [in a particular document]' ". *Id.* (quoting *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 149, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975)). Accordingly, the reason for which McDonnell seeks disclosure of the medical records at issue—access to information for the purposes of writing a book—is irrelevant to whether disclosure is proper.

▪ Instead, whether disclosure of a private document is warranted under Exemption 6 must turn, like disclosure under Exemption 7(C), on the nature of the requested document and its relationship to "the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny' " *Department of Air Force v. Rose,* 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976) (construing Exemption 6), "rather than on the particular purpose for which the document is being requested." *Reporters Comm.,* 489 U.S. at 772, 109 S.Ct. at 1481. This basic policy is one of "full agency disclosure unless information is exempted under clearly delineated statutory language," *Rose,* 425 U.S. at 360–61, 96 S.Ct. at 1599, and "focuses on the citizens' right to be informed about 'what their government is up to.' " *Reporters Comm.,* 489 U.S. at 773, 109 S.Ct. at 1481. "[I]n the typical case in which one private citizen is seeking information about another[,] the requester does not

intend to discover anything about the conduct of the agency that has possession of the requested records." *Id.* This maxim applies to the present case, where McDonnell seeks medical information about a private individual. Disclosure of this information "would not shed any light on the conduct of any Government agency or official." *Id.* Accordingly, McDonnell has not asserted a public interest in disclosure sufficient to outweigh the compelling privacy interest an individual has in keeping his or her medical records out of the public eye.

This does not mean, however, that there is *no* public interest in disclosure of these records. As the Supreme Court in *Reporters Committee* said,

> If respondents are entitled to have the FBI tell them what it knows about Medico's criminal history, any other member of the public is entitled to the same disclosure—whether for writing a news story, for deciding whether to employ Medico, to rent a house to him, to extend credit to him, or simply to confirm or deny a suspicion. There is, unquestionably, *some* public interest in providing interested citizens with answers to their questions about Medico. But that interest falls outside the ambit of the public interest that the FOIA was enacted to serve.

*Id.* at 775, 109 S.Ct. at 1483.

The same is true in the present case. It is beyond dispute that an individual has a substantial privacy interest in his or her medical records. *See id.* at 762, 109 S.Ct. at 1476 (protected personal privacy interest includes individual interest in avoiding disclosure of personal matters) (quoting *Whalen v. Roe,* 429 U.S. 589, 598–99, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977)); *United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 577 (3d Cir.1980) (medical records, "which may contain intimate facts of a personal nature," entitled to privacy protection); *Plain Dealer Pub. Co. v. Department of Labor,* 471 F.Supp. 1023, 1027–29 (D.D.C.1979). It is nevertheless possible to imagine many reasons why a variety of persons would have an interest in seeking disclosure of a person's medical records—as, for example, in the

present case, where an author seeks information in order to complete a documentary account of persons involved in a historical event. Although this minimal public interest is not sufficient to compel disclosure where a living individual has a strong privacy interest in withholding his medical records, it may be sufficient to compel disclosure where the Government has asserted no competing privacy interest. This could be the case here if the individual whose medical records McDonnell seeks is deceased. Accordingly, the Government should determine whether this individual is deceased or still living. If he is deceased, then the Government must assert some privacy interest other than the individual's interest in keeping this personal information from public view in order to justify continued withholding of the requested information. If the individual is still living, then the Government may continue to withhold the documents under Exemption 6.

### D. *Exemption 7(C)—Law Enforcement Records & Personal Privacy*

Exemption 7(C) permits withholding of "records or information compiled for law enforcement purposes" to the extent that the production of such material "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C.A. § 552(b)(7)(C) (West Supp.1993). This exemption is similar to Exemption 6 in that it involves a balancing of public and private interests:

> Exemption 7(C)'s protection of personal privacy is not absolute.... [T]he proper approach to [plaintiff's] request under a privacy-based exemption such as § 7(C) is a *de novo* balancing, weighing the privacy interest and the extent to which it is invaded, on the one hand, against the public benefit that would result from disclosure, on the other.

*Lame v. Department of Justice,* 654 F.2d 917, 923 (3d Cir.1981) ("*Lame I*") (quoting *Ferri v. Bell,* 645 F.2d 1213, 1217 (3d Cir. 1981), *modified,* 671 F.2d 769 (3d Cir.1982)) (citations omitted); *see Cuccaro v. Secretary of Labor,* 770 F.2d 355, 359 (3d Cir.1985) (Exemption 7(C) protects identity of individuals where disclosure would be likely to cause harassment or embarrassment because of person's cooperation in investigation or nature of information disclosed) (citing *Lame I,* 654 F.2d at 923).

Exemption 7(C)'s privacy language is, however, broader than the comparable language in Exemption 6 in two respects. First, although Exemption 6 requires that the invasion of privacy be "clearly unwarranted," the adverb "clearly" is omitted from Exemption 7(C). Second, Exemption 6 refers to disclosure that "would constitute" an invasion of privacy, while Exemption 7(C) encompasses any disclosure that "could reasonably be expected to constitute" such an invasion. *Compare* 5 U.S.C.A. § 552(b)(6) *with id.* § 552(b)(7)(C); *see Reporters Comm.,* 489 U.S. at 756, 109 S.Ct. at 1473; *see also Keys v. United States Dept. of Justice,* 830 F.2d 337, 346 (D.C.Cir.1987) (government need only demonstrate reasonable expectation of invasion of personal privacy to invoke Exemption 7(C)). "Thus, the standard for evaluating a threatened invasion of privacy interests resulting from the disclosure of records compiled for law enforcement purposes is somewhat broader than the standard applicable to personnel, medical, and similar files." *Reporters Comm.,* 489 U.S. at 756, 109 S.Ct. at 1473.

The Government withheld seven categories of information under Exemption 7(C). The district court granted summary judgment to the Government on six of those categories, thereby endorsing the Government's decision not to disclose the requested information. On the seventh category, however, the district court granted summary judgment to McDonnell and ordered the Government to disclose the information he requested. The following discussion first reviews the district court's order granting summary judgment to the Government, then proceeds to examine its order granting summary judgment to McDonnell.

#### 1. *The Order Granting Summary Judgment to the Government*

The bulk of the information the Government withheld under Exemption 7(C) relates to the FBI's investigation of "a suspicious or radical crew member aboard the

'Morro Castle.'" Appellee's Brief, at 38 n. 30. This information includes the following six categories: (1) Identities of special agents and other employees of the FBI and of Navy law enforcement personnel; (2) identities of other federal government employees; (3) identifying data about third parties mentioned in FBI and Navy files; (4) information revealing the FBI's investigative interest in third parties; (5) identities of other law enforcement personnel; and (6) identifying data concerning third parties who provided information in the course of their employment. The Government has agreed to disclose to McDonnell information about persons who its files show are deceased.

McDonnell does not dispute that this information about the FBI investigation was compiled for law enforcement purposes. *See FBI v. Abramson*, 456 U.S. 615, 622, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376 (1982) (indicating that Exemption 7 requires two prong inquiry into (1) whether requested documents is as compiled for law enforcement purposes, and (2) whether "release of the material would have one of the six results specified in the Act"). Instead, he challenges the magistrate judge's determination that disclosure of the information withheld could reasonably be expected to constitute an unwarranted invasion of privacy.

McDonnell presented two justifications for disclosure to the magistrate judge. First, he asserted his commercial interest in writing a thoroughly researched and well-documented book. As discussed under Exemption 6, this is not a public interest justifying FOIA disclosure. *See Reporters Comm.*, 489 U.S. at 772–73, 109 S.Ct. at 1481.

Second, McDonnell asserted the purpose his attempt to uncover information is the shedding light on an interesting piece of history. In this regard, the magistrate judge noted that McDonnell "seeks to denude the defendants' practices to determine what exactly happened on September 8, 1934." App. at 409. This justification is precisely the type of public interest the FOIA recognizes—scrutiny of government agency action. *Landano v. United States Dept. of Justice*, 956 F.2d 422, 428 (3d Cir.1992), vacated in part on other grounds and remanded, ——

U.S. ——, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993). The magistrate judge nevertheless determined that the balance is "not tilted emphatically in favor of disclosure" and concluded that the individuals' privacy interests in the six categories of information outlined above outweighed the value to the public of disclosure. The district court adopted the magistrate judge's recommendation to grant summary judgment to the Government, thereby permitting it to withhold the requested information.

### a. *Privacy Interests*

The six categories of information that the Government withheld under Exemption 7(C) concerns only the identities, or information relating to the identities, of individuals who took part in the Morro Castle disaster or its investigation. We considered a similar request for disclosure of identities of persons involved in a criminal investigation in *Landano v. United States Department of Justice*, 956 F.2d at 426. There we recognized "that individuals who are associated with a criminal investigation have a privacy interest under Exemption 7(C) of the FOIA such that the government may be justified in refusing to disclose their names." *Id.* at 427 (citing *Patterson by Patterson v. FBI*, 893 F.2d 595, 601 (3d Cir.), *cert. denied*, 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990)). Although suspects have the most obvious privacy interest in not having their identities revealed, *id.* at 426 (citing *Baez v. United States Dep't of Justice*, 647 F.2d 1328, 1338 (D.C.Cir.1980)), interviewees and witnesses also have a substantial privacy interest because disclosure may result in embarrassment and harassment. *Id.* Law enforcement personnel involved in a criminal investigation have a similar privacy interest under Exemption 7(C) in not having their identities disclosed. *Id.* (citing *Patterson*, 893 F.2d at 601).

The six categories of withheld information include the identities of law enforcement personnel, witnesses and interviewees, and suspects. The Government set forth in an affidavit specific reasons why these persons have a privacy interest in nondisclosure of their identities. That affidavit also sets forth

the reasons why persons who do not neatly fit into any of these categories have an interest in nondisclosure of their identities.

 McDonnell argues that the passage of time since the investigation negates any individual's privacy interest in nondisclosure. We expressly rejected this concept in *Landano,* declaring that "[w]hile the privacy interest of those involved in a criminal investigation may become diluted by the passage of time, . . . the potential for embarrassment and harassment may endure for many years." 956 F.2d at 427 (citing *Keys,* 830 F.2d at 348; *Diamond v. FBI,* 707 F.2d 75, 77 (2d Cir.1983), *cert. denied,* 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984)). We agree with the district court that the Government has asserted a valid privacy interest in withholding the identities of living persons in each of these categories.[19]

### b. *Public Interest*

The next step in the inquiry is to examine the public interest in disclosure. As noted above, McDonnell asserts the public interest of discovering governmental practices and actions in connection with the Morro Castle disaster and its subsequent investigation. Although scrutiny of government action is the precise purpose for which the FOIA was enacted, *see Landano,* 956 F.2d at 428, it is difficult to see how the disclosure of the identities of persons in the six enumerated categories will further McDonnell's scrutiny of governmental action in this case. The Government indicated in the Llewellyn Declaration that it has disclosed to McDonnell documents pertaining to the investigation after redacting the names of persons involved and any information reasonably calculated to lead to those names. The connection between the disclosure of these identities and the furtherance of McDonnell's asserted interest in scrutinizing government action is not enough to override the individuals' privacy interest in nondisclosure. For this rea-son, we agree with the district court that the Government may withhold pursuant to Exemption 7(C) the identities of persons in each of the six categories listed above.

### 2. *The Order Granting Summary Judgment to McDonnell*

 In addition to those six categories of information, the Government invoked Exemption 7(C) to withhold a seventh category of information which included the names and personal information of witnesses and third parties interviewed about the Morro Castle disaster. The Government says it refused to disclose this information because release of the names of persons providing information during the course of an FBI interview could jeopardize future cooperation with FBI investigations. The magistrate judge determined that this justification did not demonstrate the invasion of personal privacy Exemption 7(C) requires, and recommended that the FBI release any information held in reliance on this exemption. The district court adopted the magistrate judge's recommendation and entered summary judgment for McDonnell on this issue.

The magistrate judge correctly determined that the Government's asserted interest in assuring future cooperation of witnesses with FBI investigations is not a valid reason for refusing to disclose information under Exemption 7(C). Nevertheless, *Landano* expressly recognized that individuals involved in a criminal investigation, "including suspects, witnesses, interviewees, and investigators[,]" have a privacy interest under Exemption 7(C) in not having their names revealed in connection with disclosure of the fact and subject matter of the investigation. 956 F.2d at 426–27. Thus, under *Landano* the Government had a valid justification for refusing to disclose the names and personal information of witnesses and third parties involved in the Morro Castle disaster and investigation.

---

19. McDonnell argues that the Government cannot assert the privacy interests of persons identified in its files. This argument has no merit. *See Reporters Committee,* 489 U.S. at 772–75, 109 S.Ct. at 1481–82. McDonnell also argues that the Government's assertion of Exemption 7(C) to withhold information somehow prevents the per-son who are the subject of that information from revealing that information if they so choose. This argument is likewise without merit. The FOIA in no way prevents a person from waiving his or her privacy interest in information withheld by the government by making that information public. *See id.*

*Landano* also recognized, however, the possibility that the privacy interests of such persons may become diluted by the passage of time. *Id.* at 427. Nevertheless, even taking into account the passage of seventy years since the Morro Castle disaster, we fail to see how disclosure of identities and personal information regarding persons interviewed during the course of the Government's investigation will further scrutiny of governmental action, the purpose of the FOIA. *See Landano,* 956 F.2d at 428. There is an insufficient nexus between the information sought and the public interest at stake to override the interviewees' privacy interest in their identities and personal information. We will therefore reverse the order of the district court granting McDonnell summary judgment on this issue as it pertains to persons who are still living. Persons who are deceased have no privacy interest in nondisclosure of their identities, so the Government should disclose information about them as required by the district court's order.

### E. *Exemption 7(D)—Law Enforcement Records & Confidential Sources*

Exemption 7(D) excepts from disclosure [R]ecords or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

5 U.S.C.A. § 552(7)(D) (West Supp.1993). As with the other FOIA exemptions, the Government bears the burden of establishing that the exemption applies. 5 U.S.C.A. § 552(a)(4)(B) (West 1977).

McDonnell does not contend that the records and information the Government withheld under Exemption 7(D) were not compiled for law enforcement purposes. Instead, he challenges the district court's determination that the identities of third parties who provided information, as well as the information they provided, are exempt from disclosure because they were confidential sources within the meaning of the statute.

Under Exemption 7(D), the question is not whether the requested document is of the type that the agency usually treats as confidential, but whether the particular source spoke with an understanding that the communication would remain confidential. *United States Dept. of Justice v. Landano,* — U.S. —, —, 113 S.Ct. 2014, 2019, 124 L.Ed.2d 84 (1993); *see Dow Jones & Co. v. Department of Justice,* 917 F.2d 571, 575–76 (D.C.Cir.1990) (availability of Exemption 7(D) turns on whether source provided information in confidence at the time it communicated to with government). Unlike Exemption 7(C), Exemption 7(D) does not turn on whether disclosure of records would constitute an unwarranted invasion of privacy, and thus disclosure under 7(D) does not entail a balancing of public and private interests. *See Lame I,* 654 F.2d at 923. Instead, a source is confidential within the meaning of Exemption 7(D) if the source " 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.' " *Landano,* — U.S. at — – —, 113 S.Ct. at 2019–20 (quoting S.Rep. No. 93–1200, p. 13 (1974)); *See Lame I,* 654 F.2d at 923.

At oral argument on the parties' cross-motions for summary judgment, the magistrate judge ordered the FBI to submit a declaration regarding the circumstances surrounding the interviews of third parties who were members of the public. This order was in response to two letters McDonnell had submitted from interviewees stating that they had not received either express or implied assurances of confidentiality when the FBI interviewed them. In response to the court's directive, the FBI submitted the Third Declaration of Angus Llewellyn, which explained that the Government gave both implied and express assurances of confiden-

tiality to third parties. The following discussion examines the district court's conclusions with regard to individuals given both types of assurances.

### 1. Express Assurances of Confidentiality

■ Relying on the Third Llewellyn Declaration, the magistrate judge determined that one person who provided information throughout the course of the FBI's investigation of the Morro Castle incident was given an express assurance of confidentiality. The magistrate judge also determined that the Government gave an express assurance of confidentiality to an informant named in the files pertaining to George White Rogers. The identity of this source was considered so sensitive that he or she was assigned a symbol source number and was never referred to by name in the file. The district court did not err in adopting the magistrate judge's conclusion that the identity of and information provided by these two persons are exempt from disclosure under the express language of Exemption 7(D). *See* 18 U.S.C.A. § 552(b)(7)(D).

■ McDonnell argues that sufficient time has passed since the FBI's investigation of the Morro Castle disaster to render the information the Government has withheld under Exemption 7(D) disclosable. Unlike Exemption 7(C), however, the availability of Exemption 7(D) does not turn on the existence of an individual privacy interest. *Landano*, 956 F.2d at 431. Thus, although McDonnell's argument has logical merit under Exemption 7(C), which focuses on the privacy interest of the individual, it conflicts with the goal of Exemption 7(D) to protect the ability of law enforcement agencies to obtain the cooperation of persons having relevant information and who expect a degree of confidentiality in return for their cooperation. *See id.* This difference between Exemptions 7(C) and 7(D) is illustrated by the fact that the district court's order requiring the Government to determine whether certain persons in connection with whom it withheld information under Exemption 7(C) are now deceased does not extend to the information withheld pursuant to Exemption 7(D). Because Exemption 7(D) does not depend on the viability of an individual's privacy interest, McDonnell's argument has no merit.

### 2. Implied Assurances of Confidentiality

■ The Government argues that the district court erred in granting summary judgment to McDonnell on his claim that the Government improperly withheld documents under Exemption 7(D) on grounds that it claimed to have given implied assurances of confidentiality to third parties it interviewed in connection with the Morro Castle disaster. The Government proposes that the application of Exemption 7(D) revolves around a content based analysis. The Government asserts that "when a third party was interviewed concerning a suspicious or radical member of the [Morro Castle] crew, this person's name [should be] exempted from disclosure pursuant to the provisions of exemption (b)(7)(D)." The Government further explained that it did not disclose the names of these persons because "they provided investigative, not historical, information. To release the names and information provided by such a third party would jeopardize future FBI investigations where this investigative tool, interviewing, is a necessity." App. at 66–67. Thus, the Government would have the court grant or deny Exemption 7(D) status on the basis of whether the content of the document was historical or investigative in nature. As the magistrate judge concluded, and *Landano* clearly indicates, such a content based test in not appropriate in evaluating a document for Exemption 7(D) status, rather the proper focus of inquiry is on the *source* of the information. *See Landano*, — U.S. at ——, 113 S.Ct. at 2019.

The Government further asserted:

Persons interviewed often assume, quite logically, that the information they furnish is for the assistance of the FBI only.... Persons providing information, who may expect to be called upon at a later time to testify in public at a judicial proceeding, should be secure in the knowledge that, absent the necessity of such public testimony with its attendant judicial restraints and protections, their assistance to the Government will be held in confidence and that this confidentiality will not be violated.

The fear of such exposure all too often inhibits the cooperation of otherwise conscientious citizens. These considerations have been met by the traditional willingness and ability of the FBI to assure persons interviewed that their identities would be protected. To disclose the identity of persons interviewed under such circumstances would be more than an unwarranted invasion of personal privacy; it would breach the confidentiality under which they were interviewed.

App. at 67–68.

The magistrate judge rejected the Government's argument, from the circumstances described above, that the interviewees could infer a promise of confidentiality. Instead, the magistrate judge declared that the Government had "failed to produce evidence, such as declarations from interviewers, stating that when they interviewed third parties (*i.e.*, passengers on the Morro Castle) how they impliedly assured the interviewees that their statements would be held in confidence." App. at 418–19.

At the time the magistrate judge issued the report and recommendation, this Court had not yet addressed the question of what is an implied assurance of confidentiality under Exemption 7(D). Noting this, the magistrate judge expressly rejected the holding of the United States Court of Appeals for the District of Columbia Circuit in *Dow Jones* that "in absence of evidence to the contrary, promises of confidentiality are inherently implicit when the FBI solicits information," in the course of a law enforcement investigation. *Dow Jones*, 917 F.2d at 576 (citations omitted). The magistrate judge nevertheless held that even if *Dow Jones* set forth the applicable standard, McDonnell had rebutted any presumption of confidentiality arising from the mere fact that the FBI had interviewed the third parties in the course of a criminal investigation by supplying the declaration of Thomas Torresson, Jr., the former 3rd Assistant Purser on the Morro Castle, who stated that although he was questioned on a number of occasions regarding the Morro Castle incident, he was never afforded either an express or an implied assurance of confidentiality. For these reasons, the mag-

istrate judge concluded that the Government was not entitled to withhold the identities of or information provided by third parties to which it claimed it had given implied assurances of confidentiality.

As noted above, the magistrate judge rendered her decision before this Court had addressed what constituted an implied assurance of confidentiality under Exemption 7(D). We decided this issue in *Landano* and, like the magistrate judge, rejected the holding of the United States Court of Appeals for the District of Columbia Circuit and five other courts of appeals that " 'promises of confidentiality are inherently implicit in FBI interviews conducted pursuant to a criminal investigation.' " *Landano*, 956 F.2d at 432–33 (citing *Dow Jones*, 917 F.2d at 576; *KTVY–TV v. United States*, 919 F.2d 1465, 1470–71 (10th Cir.1990); *Donovan v. FBI*, 806 F.2d 55, 61 (2d Cir.1986); *Brant Constr. Co. v. United States EPA*, 778 F.2d 1258, 1263 (7th Cir.1985); *Ingle v. United States Dept. of Justice*, 698 F.2d 259, 269 (6th Cir.1983); *Pope v. United States*, 599 F.2d 1383, 1386–87 (5th Cir.1979)) (other citations omitted). Relying on *Lame I*, 654 F.2d at 929, we held that the government must show the particular circumstances of an interview or source in order to establish that it issued an implied assurance of confidentiality thus enabling it to withhold documents under Exemption 7(D). *Landano*, 956 F.2d at 435. Specifically, we declared that the government must provide " 'detailed explanations relating to each alleged confidential source' " in order to justify withholding information under Exemption 7(D). *Id.* (quoting *Lame I*, 654 F.2d at 928).

The Supreme Court granted certiorari in *United States Dept. of Justice v. Landano*, —— U.S. ——, 113 S.Ct. 51, 121 L.Ed.2d 21 (1992), in order to resolve this conflict among the circuits over the nature of the government's evidentiary burden under Exemption 7(D). —— U.S. at ——, 113 S.Ct. at 2014. In deciding the issue, the Supreme Court clearly teaches us that a source should be deemed confidential if it furnished information with the understanding that the government would not divulge the communication except to the extent the FBI thought

necessary for law enforcement purposes. *Id.* at ——, 113 S.Ct. at 2019–20. The Government may not carry its burden of establishing a source's confidentiality, however, simply by asserting that a source communicated with the government during the course of a criminal investigation. *Id.* at ——, 113 S.Ct. at 2021–23. The Supreme Court thus rejected the presumption of confidentiality promulgated by the United States Court of Appeals for the District of Columbia Circuit and five other courts of appeals. *Id.* Despite its conclusion that it is unreasonable to infer that all governmental criminal investigative sources are confidential, the Supreme Court refused to embrace the view at the opposite end of the spectrum that the government must specifically detail the circumstances giving rise to an implied assurance of confidentiality for each source as we had expressed in *Landano*. *Id.* at ——, 113 S.Ct. at 2023–24.

Instead, the Supreme Court chose a middle ground and recognized that the government "often can point to more narrowly defined circumstances that will support the inference." *Id.* at ——, 113 S.Ct. at 2023. For example, it is reasonable to infer that paid informants normally expect their cooperation with the government to be kept confidential. *Id.* Other "generic circumstances," such as the character of the crime at issue and the source's relation to the crime, may similarly support an inference of an implied assurance of confidentiality. *Id.* Thus, when the government seeks to withhold a document under Exemption 7(D), it is entitled to a presumption of confidentiality if it can show that the nature of the crime and the source's relation to it support an inference of confidentiality. *Id.* "Armed with this information, the requester will have a more realistic opportunity to develop an argument that the circumstances do not support an inference of confidentiality. To the extent that the Government's proof may compromise legitimate interest, of course, the Government still can attempt to meet 'its burden with *in camera* affidavits." *Id.* at ——, 113 S.Ct. at 2024.

The parties obviously have not had an opportunity to address the Government's claims of confidentiality under this newly announced standard. Although the Government concedes that it cannot meet the particularized standard of proof this Court's opinion in *Landano* would have required, the Supreme Court rejected that standard in favor of a more lenient one. We will accordingly vacate the portion of the district court's order granting summary judgment to McDonnell under Exemption 7(D) and remand to the district court for reconsideration of this issue under the Supreme Court's standard in *Landano*. *Accord Oliva v. United States Dept. of Justice*, 996 F.2d 1475, 1476 (2d Cir.1993); *Manchester v. DEA*, 823 F.Supp. 1259, 1272 (E.D.Pa.1993).[20]

## IV. *Conclusion*

Because this involved case has resulted in an equally involved and lengthy opinion, we end by summarizing our holdings.

### A. *Preliminary Issues*

We first addressed three preliminary issues before going to the merits. The first issue concerns whether we have appellate jurisdiction over this case. We do. Even assuming that there is a pending motion for attorneys' fees in the district court, this constitutes no bar to our exercise of appellate jurisdiction under 28 U.S.C.A. § 1291.

The second issue concerns whether plaintiff Rasmussen has standing to pursue this lawsuit under the FOIA. Although he and McDonnell seek information about the Morro Castle in order to co-author a book, Rasmussen's signature does not appear on any of the FOIA requests, and he did not formally pursue any administrative remedies upon denial of the requests. Because he has not made any formal requests for documents under the FOIA, he has no standing to challenge the Government's decision to withhold documents that only McDonnell requested.

---

**20.** The Government claims that remand is unnecessary because all of the information exempt from disclosure by Exemption 7(D) is also exempt by Exemption 7(C). The district court should determine the degree of overlap, if any, on remand.

The third and final preliminary issue which we considered was McDonnell's argument that he was not required to exhaust his administrative remedies before challenging in district court the Government's withholding of documents regarding Oscar Niger. We held his argument is without merit. Although the Government missed the ten-day statutory deadline for responding to a FOIA request under § 552(a)(6)(C), it responded to the request before McDonnell moved to amend his complaint to include the withheld documents. The district court thus correctly dismissed this portion of McDonnell's lawsuit for lack of subject matter jurisdiction.

## B. *FOIA Exemptions*

After deciding the three preliminary issues outlined above, we considered the parties' claims under five separate exemptions to the general FOIA policy of full disclosure. The first exemption we considered is Exemption 1, the National Security Exemption. The Government presented an affidavit describing the withheld information, stating the reason for the withholding, and establishing why disclosure of the information would constitute a threat to national security. McDonnell provided no evidence to controvert the Government's showing that the requested information falls within Exemption 1. We will therefore affirm the district court's order granting summary judgment to the Government on Exemption 1.

The second exemption we considered is Exemption 3, which permits an agency to withhold matters specifically exempted from disclosure by another statute if certain requirements are met. The Government withheld documents under Exemption 3 on grounds that they fell within the general secrecy requirements of two other statutes. The first is Federal Rule of Criminal Procedure 6(e)(2), which prevents disclosure except in certain enumerated circumstances of matter presented to a grand jury. We will affirm the district court's order granting summary judgment to the Government on its refusal to disclose requested information that falls within the scope of Rule 6(e)(2) and Exemption 3.

The second statute on which the Government relied is 18 U.S.C.A. § 5038, which provides for nondisclosure of juvenile records, subject to certain enumerated exceptions. McDonnell seeks the New Jersey juvenile records of George White Rogers. Because § 5038 imposes a secrecy requirement on federal juvenile records only, the records McDonnell seeks do not fall within the scope of that statute. The Government has not asserted that any other exemption prevents disclosure of Rogers' juvenile records. Accordingly, we will reverse the order of the district court granting summary judgment to the Government on § 5038 and Exemption 3.

Third, we addressed the applicability of Exemption 6, which exempts from disclosure personnel, medical, and similar files when their disclosure "would constitute a clearly unwarranted invasion of personal privacy." Disclosure of the medical files of an unnamed individual would not likely advance the purpose of the FOIA to subject government agency action to public scrutiny. Nevertheless, if the individual whose files are at issue is deceased, then he has no privacy interest subject to invasion by disclosure. In accordance with the basic FOIA policy of full disclosure in absence of an applicable exemption, we will order the Government to determine whether the unnamed individual is deceased. If he is, then the Government must disclose the medical files unless it asserts another valid exemption justifying withholding. If the individual is living, then the order of the district court granting summary judgment to the Government on Exemption 6 will be affirmed.[21]

The fourth exemption we addressed is Exemption 7(C), which permits an agency to

---

**21.** We note that McDonnell also complains about the illegibility of some of the documents that have been furnished to him. The Morro Castle files were transferred in 1954 to microfilm from documents that had been extensively used in the twenty-year period between that transfer and the original 1934 disaster. Because the original documents are no longer available, the FBI conducted its FOIA review process in three steps: (1) Transferring the microfilm document onto specially heat-treated Kodak paper, or "slick," (2) creating a second "dry" copy from the slick and excising any exempt material by "brown-outs," and (3) copying the "browned-out" dry copy for release to McDonnell.

The magistrate judge found that a number of these documents released to McDonnell were illegible as a result of the review process, and

withhold records or information compiled for law enforcement purposes to the extent that the production of such material "could reasonably be expected to constitute an unwarranted invasion of personal privacy." We will affirm the order of the district court granting summary judgment to the Government on this exemption as it applies to six categories of requested material containing the identities of, or information about, individuals who were involved in the Morro Castle disaster or the subsequent governmental investigation. We will reverse, however, the district court's order granting summary judgment to McDonnell under Exemption 7(C) on a seventh category of material which includes the names and personal information of witnesses and third parties interviewed concerning the Morro Castle disaster.

The final exemption we addressed is Exemption 7(D), which excepts from disclosure records of information compiled for law enforcement purposes that could reasonably be expected to identify a confidential source. This exemption turns on whether the source received either express or implied assurances of confidentiality from the government at the time of the interview. We will affirm the district court's order granting summary judgment to the Government on the documents withheld because the interviewees received express assurances of confidentiality. We will vacate, however, the order of the district court granting summary judgment to McDonnell regarding documents withheld because the Government claimed the interviewees received implied assurances of confidentiality, and remand to the district court in order to afford the parties an opportunity to address this issue under the standard of proof the Supreme Court recently announced in *Landano*.

indeed the copies of several documents included in the record are impossible to read. The Government nevertheless asserted during oral argument that new technology had enabled it to produce better quality copies, which it has supplied to McDonnell. Of course, we anticipate that McDonnell will receive the best possible reproductions of the documents to which he is entitled. If it is impossible to make legible copies, but the microfilm is legible, then arrangements could be made to have redacted transcripts prepared by a transcriber with appropriate security clearance. Such copies, of course, should be made at the expense of the plaintiff.